**PENNSYLVANIA ENVIRONMENTAL COUNCIL, INC., a Pennsylvania Corporation, et al., Appellants,**

v.

**Robert G. BARTLETT, individually and as Secretary of the Department of Highways of the Commonwealth of Pennsylvania, et al., appellees.**

**No. 19453.**

United States Court of Appeals, Third Circuit.

Submitted on Briefs Oct. 22, 1971.

Decided Dec. 1, 1971.

Robert Broughton, Pittsburgh, Pa., for appellants.

Dennis M. O'Connell, Dept. of Justice, Washington, D. C., for Federal appellees.

Edward A. Hosey, Asst. Atty. Gen., Harrisburg, Pa., for appellee, Robert G. Bartlett.

ALDISERT, GIBBONS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from a final judgment denying a permanent injunction and dismissing the complaint. The plaintiff-appellants seek to enjoin a planned relocation of Pennsylvania Route 872 and to prevent the use of federal funds for the relocation project. Plaintiffs are the Pennsylvania Environmental Council, Inc., a Pennsylvania nonprofit corporation, the Allegheny Mountain Chapter of Trout Unlimited, an unincorporated association, and several individual sportsmen. The defendants are the Secretary of Transportation of the United States, the Pennsylvania Secretary of Highways, and the contractors who prior to the commencement of the suit were awarded construction contracts for the projects. The opinion of the district court is reported. Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa. 1970). That opinion sets forth the facts in considerable detail, and we will repeat only those which we deem necessary for our disposition of the case.

The project involved the relocation, entirely within land owned by the Pennsylvania Department of Forest and Waters and the General State Authority of the Commonwealth of Pennsylvania, of eight-tenths of a mile of Pennsylvania Legislative Route 52001, also known as Traffic Route 872. That road runs in a northerly-southerly direction through Potter and Cameron Counties. For part of its fifty mile length it parallels the First Fork of Sinnemahoning Creek, a tributary of the Susquehanna River frequented by sports fishermen. The challenged relocation, decided upon by the Pennsylvania Highways Department after consultation with the Pennsylvania Fish and Game Commission and consent by the Pennsylvania Department of Forests and Waters, Water and Power Resources Board, involved an incursion of the roadway into the bed of Sinnemahoning Creek.

On November 6, 1969, the Pennsylvania Highways Department filed an application with the Secretary of Transportation, pursuant to 23 U.S.C. § 117 (1971) for federal assistance for the improvement as a part of the Federal-aid secondary system. The Secretary approved the project on November 20, 1969; bids were received on December 19, 1969, and contracts awarded on December 29, 1969. The contractors commenced construction on February 2, 1970, and the plaintiffs' complaint was filed on March 31, 1970. After the complaint was filed on April 8, 1970, the plans were revised by the Pennsylvania authorities to elevate a proposed flood plane along the entire length of the project. This was done on the recommendation of the State Department of Forests and Waters for environmental reasons. The trial took place on April 20–22, 1970, and the final judgment was entered on August 25, 1970. As we will develop hereinafter, several of these dates become crucial in the resolution of the legal issues tendered by the plaintiffs.

When the district court declined to issue an injunction the plaintiffs applied to this court for an injunction pending appeal, which was denied on December 9, 1970. We have been advised, by an affidavit dated October 15, 1971, that the relocated road has been completed and was open to traffic by September 3, 1971.

Plaintiffs' contentions may be summarized as follows:

(1) The project was approved by the Secretary of Transportation in violation of the hearing requirements of the Federal Aid Highway Act, 23 U.S.C. § 128 (1971) as that statute is interpreted in the regulations of the Department of Transportation, 23 C.F.R. Part 1, Appendix 1 (1971).

(2) The project was approved by the Secretary of Transportation in violation of the statutes dealing with protection of parklands, Federal Aid Highway Act, 23 U.S.C. § 138 (1971); Department of Transportation Act, 49 U.S.C. § 1653(f) (1971).

(3) The project involves the incursion of a dike into a navigable stream, and in the absence of consent by Congress and approval of plans by the Chief of Engineers and by the Secretary of the Army,[1] violates The Rivers and Harbors Act of 1899, 33 U.S.C. § 401 (1971).

(4) The project was approved by the Secretary of Transportation in violation of the National Environmental Policy Act. Act of Jan. 1, 1970, Pub.L.No.91–190 § 1 et seq.; 42 U.S.C. § 4321 et seq. (1971).

The defendants contend that each of the aforesaid statutes had been fully complied with or is inapplicable. All assert as defenses:

(A) That the plaintiffs lacked standing to bring the suit;

(B) That the plaintiffs were guilty of laches.

The defendant Bartlett and the contractor defendants assert, as well, the defense that they are instrumentalities of the Commonwealth, and hence immune from suit under the eleventh amendment. Finally all defendants suggest that the appeal has become moot because the project is completed.

### I. Compliance With The Notice And Hearing Requirements

The Federal Aid Highways Act recognizes three separate highway systems: the primary, the secondary, and the interstate systems. 23 U.S.C. § 103(a) (1971). Different statutory and regulatory standards apply to each system. The application for a federal grant by Pennsylvania for the relocation of Route 872 was made as a part of the secondary system. It was submitted pursuant to 23 U.S.C. § 117 (1971), which in part provides:

"(a) The Secretary may, upon the request of any State highway department, discharge his responsibility relative to plans, specifications, estimates, surveys, contract awards, design, inspection, and construction of all projects on the Federal-aid secondary system by his receiving and approving a certified statement by the State highway department setting forth that the plans, design, and construction for each such project are in accord with those standards and procedures which (1) were adopted by such State highway department, (2) were applicable to projects of this category, and (3) were approved by him."

In the case of secondary system applications, in other words, the Secretary may rely upon a state certificate of compliance with federal standards, apparently without undertaking any independent investigation. The Secretary's freedom of action under § 117 must, however, be deemed to be limited by at least two other statutes. One is the public hearing provision, 23 U.S.C. § 128 (1971).[2] Anoth-

---

1. The statute has been amended recently to require the approval of the Secretary of Transportation instead of that of the Secretary of the Army and the Chief of Army Engineers. Act of October 15, 1966, Pub. L. No. 89–670 § 6(g) (6) (A); 49 U.S.C. § 1655(g) (6) (A) (1971). The Secretary of Transportation has delegated his authority under those provisions to the

Commandant of the Coast Guard. 49 C. F.R. § 1.46(c) (8) (1971).

2. That provision reads in part as follows: "§ 128. Public hearings
(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorpo-

er is § 2(b) (2) of the Department of Transportation Act, 49 U.S.C. § 1651(b) (2) (1971), which provides:

> "(2) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

Implementing 23 U.S.C. § 128 and 49 U. S.C. § 1651(b) (2), the Secretary has issued Policy and Procedure Instructional Memorandum 20–8 (P.P.M. 20–8) promulgated pursuant to 23 C.F.R. § 1.32 (1971) and reproduced in 23 C.F.R. Appendix A (1971). This Instructional Memorandum setting forth the Secretary's interpretation of the governing statutes, provides when and for what purposes public hearings on highway projects shall be held. Indeed P.P.M. 20–8 may have a vitality of its own aside from §§ 128 and 1651(b) (2) by virtue of Section 9(e) (2) of the Department of Transportation Act, 49 U. S.C. § 1657(e) (2) (1971) which gives the Secretary rule making powers.[3]

P.P.M. 20–8 is by its express terms applicable to all Federal-aid highway projects. P.P.M. 20–8 § 3. It defines two separate types of public hearings; a "corridor public hearing" (§ 4(a)) which is held before a route location is approved and before a State highway department is committed to a specific proposal, and a "highway design public hearing." A "highway design public hearing" is a public hearing that:

> "(1) Is held after the route location has been approved, but before the State highway department is committed to a specific design proposal;
>
> (2) Is held to ensure that an opportunity is afforded for effective participation by interested persons in the process of determining the specific location and major design features of a Federal-aid highway; and
>
> (3) Provides a public forum that affords a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs."

On May 8 and 15 of 1968, a notice, describing roughly the proposed location for the segment of Route 872 involved in this appeal and stating that interested citizens could request a hearing by writing the State's District Engineer, was published in the newspaper, *The Potter Enterprise*, in Coudersport, Pennsylvania. Since no written requests were received, no hearing was conducted.

▇ These notices contemplated nothing more than the equivalent of a "corridor public hearing" and the record establishes that no "highway design public hearing" was either held or noticed. Since P.P.M. 20–8 became effective on January 29, 1969, and the application for the Route 872 relocation grant was submitted to the Secretary on November 29, 1969, we must consider whether the public hearing procedures followed satisfy the requirements of P.P.M. 20–8. Initially we note that interested persons were given notice of the opportunity to request the equivalent of a corridor hearing. In the absence of any such re-

---

rated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the pur-

pose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway."

The history of § 128 is set forth in *Wildlife Preserves, Inc. v. Volpe*, 443 F.2d 1273, 1275–76 (3d Cir. 1971).

3. P.P.M. 20–8 appears in the Code of Federal Regulations as an appendix although the Department's Policy and Procedure Memoranda apparently are not published in the *Federal Register*.

quests it was not necessary to convene a corridor hearing.

The remaining question is whether § 6(a) of P.P.M. 20–8 was violated by the State's failure at a later date to afford the public notice of at least an opportunity to request a hearing on the proposed design of the new highway segment. Section 6(a) of P.P. M. 20–8 provides:

> "(a) Both a corridor public hearing and a design public hearing must be held, or an opportunity afforded for those hearings with respect to each Federal-aid highway project that:
>
> (1) Is on a new location; or
>
> (2) Would have a substantially different social, economic or environmental effect;
>
>    *    *    *    *    *    *
>
> However, with respect to secondary road programs, two hearings are not required on a project covered by a paragraph 6(a) (1) or (2) unless it will carry an average of 750 vehicles a day in the year following its completion."

There is nothing in the record before the district court which discloses the anticipated number of vehicles a day which would use Route 872. Since the plaintiffs had the burden of establishing the illegality of the Secretary's actions [4] and since a presumption of administrative regularity operates in favor of the defendants,[5] we must assume that Route 872 was reasonably expected to carry fewer than 750 cars a day. This assumption is entirely consistent with the proofs in the record about the totally rural nature of the locality. Thus, under P.P.M. 20–8 a design public hearing was not required.

P.P.M. 20–5 is the Policy and Procedure Memorandum governing applications for grants for the secondary road system pursuant to 23 U.S.C. § 117. It cross references to a number of other Policy and Procedure Memoranda, including P.P.M. 20–8, about which it says:

> "5a. A State highway department operating under an approved Plan shall follow . . . the procedures of P.P.M. 20–8 regarding public hearings on Plan projects . . ."

Hence in making its grant application under 23 U.S.C. § 117 the Pennsylvania Highway Department was, by virtue of this cross reference, entitled to omit a design public hearing on a road reasonably expected to carry fewer than 750 cars per day. P.P.M. 20–8 § 6(a) (3).

There remains the question whether P.P.M.'s 20–5 and 20–8 are correct interpretations of 28 U.S.C. § 128 and 49 U.S.C. § 1651(b) (2) with respect to the Secretary's duties in passing upon applications in the secondary road program. Considered in light of the rule of Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) we think they are.

Section 128 does not require an opportunity for a public hearing as to economic, social, or as here in issue, environmental effects with respect to every grant application. The Secretary's determination that a corridor public hearing suffices with respect to sparsely traveled secondary roads seems to us a reasonable line to have drawn, even if not the precise line we would have drawn. With respect to § 1651(b) (2), while a public hearing is a good method for acquiring the appropriate esthetic and environmental information, it is not the only method. The record discloses that other methods were resorted to. As the district court points out, the Secretary, acting pursuant to P.P.M. 20–5 obtained from the Pennsylvania Highway Department a letter and a supporting data sheet from the Pennsylvania Fish and

4. Lewes Dairy, Inc. v. Freeman, 401 F.2d 308, 316 (3d Cir. 1968).

5. Pacific States Box and Basket Co. v. White, 296 U.S. 176, 185 (1935); United States v. Chemical Foundation, 272 U. S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); Lewes Dairy, Inc. v. Freeman, supra 401 F.2d at 316.

Game Commission (Exhibit P–61) setting forth in considerable detail the specific information about ecological and esthetic effects of the project and certifying unconditional approval. 315 F. Supp. 249. 23 U.S.C. § 117 contemplates a delegation to state authority with respect to secondary system projects.

We conclude, therefore, though on somewhat different grounds than those relied on by the district court, that there was appropriate compliance with 23 U.S.C. §§ 117, 128, and with 49 U.S.C. § 1651(b) (2). What we say about the omission, after January 29, 1969, of a design public hearing, applies, of course, only to applications in the secondary road system where the road is anticipated to carry fewer than 750 cars a day.

## II. The Parklands Statute

As pointed out hereinabove, the relocation of Route 872 about which plaintiffs complain took place entirely within lands owned by the Commonwealth of Pennsylvania, part by the Pennsylvania Department of Forests and Waters and part by the General State Authority. Relying upon Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) the plaintiffs contend that the Secretary failed to comply with the mandatory duties imposed on him with respect to parklands by § 18(a) of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138 (1971) and § 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (1971). The two statutes are virtually identical, and were treated as interchangeable by the Supreme Court in *Overton Park, supra*.[6]

The district court considered several alternative routings of Route 872 in the disputed area and found that there was no feasible and prudent alternative to the plan selected. On the basis of this finding court concluded that there was no violation of § 4(f). We cannot approve this approach to the §

4(f) issue. As interpreted in *Overton Park* § 4(f) imposes upon the Secretary a mandatory duty to make findings, and there is no statutory warrant for the substitution by the district court of its judgment, for the environmental findings which the Secretary never made. *Cf.* D. C. Federation of Civil Associations v. Volpe, Nos. 24,838, 24,843 (D.C. Cir., filed October 12, 1971). If the land used for the project fell within the purview of § 4(f) the Secretary should not have approved the project without first considering alternatives to such use and next considering whether the plan includes all possible planning to minimize harm. Significantly, the district court on August 25, 1970 made these additional findings of fact:

1. No written studies of alternate alignment for Route 872 were made by the Pennsylvania Department of Highways;

2. No environmental planning was undertaken by the Pennsylvania Department of Highways on the project for the relocation of Route 872;

3. No written plans for alternate alignments for Route 872 were presented to the Pennsylvania Fish Commission or to the Pennsylvania Department of Forests and Waters for their consideration.

Since the application was made under 23 U.S.C. § 117 the Secretary, in granting approval, relied entirely upon what was done by the Pennsylvania authorities. The quoted findings make clear that the Pennsylvania authorities did not attempt to comply with § 4(f). In view of these findings we could not sustain the Secretary's approval of the application even on the assumption that in a secondary system application he could, by virtue of § 23 U.S.C. § 117 delegate his § 4(f) duties to the State. Thus we do not in this case reach that possible delegation issue.

We affirm, however, not because the findings required by § 4(f) were made,

---

6. The text of two statutes appears in the Committee Report quoted infra at p. 621 of this opinion.

but because the lands in question, on the record in this case, did not fall within its coverage.

The earlier requirements of 23 U.S.C. § 138 and 49 U.S.C. § 1653(f), which we have treated as interchangeable, first appeared in the Federal Aid Highway Act § 15(a), and in the Department of Transportation Act § 4(f), respectively. These sections are similar, though not identical.[7] Both would seem to require that the Secretary must make the determination whether a given tract intended to be used for a highway project is a public park, historic site, or in the case of the Department of Transportation Act, a recreation area, wildlife preserve or waterfowl refuge.

In 1968, the Federal-Aid Highway Act of August 23, Pub.L.No.90–495 § 18 amended, by means of its subsections (a) and (b) respectively, the Federal Aid Highway title 23 U.S.C. § 138 and the Department of Transportation title 49 U.S.C. § 1653(f) so that they read identically.[8] The conference report on the bill provides:

"The conference substitute amends both section 4(f) of the Department of Transportation Act and section 138 of title 23 of the United States Code so that the declaration of policy will be identical in each instance and this declaration reads as follows:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the

---

7. The predecessor of the present 23 U.S.C. § 138 (1971) was Act of Sept. 13, 1966, Pub.L. No. 89–574 § 15(a). As reprinted in 1 U.S. Cong. & Admin. News 1966 at pp. 910–11 that law read:
"Sec. 15(a) Chapter 1 of Title 23 of the United States Code is amended . . . as follows:
'§ 138. Preservation of parklands
'It is hereby declared to be the national policy that in carrying out the provisions of this title, the Secretary shall use maximum effort to preserve Federal, State, and local government parklands and historic sites and the beauty and historic value of such lands and sites. The Secretary shall cooperate with the States in developing highway plans and programs which carry out such policy. After July 1, 1968, the Secretary shall not approve under section 105 of this title any program for a project which requires the use for such project of any land from a Federal, State, or local government park or historic site unless such program includes all possible planning, including such consideration of alternatives to the use of such land, to minimize any harm to such park or site resulting from such use.' "
The predecessor of the present 49 U.S.C. § 1653(f) (1971) was Act of Oct. 15, 1966, Pub.L. No. 89–670 §§ 2(b) (2) and

4(f). As reprinted in 1 U.S. Code Cong. & Admin. News 1966 at pp. 1101, 1105 respectively those provisions read:
"Sec. 2(b) (2) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."
"Sec. 4(f) The Secretary shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of this Act, the Secretary shall not approve any program or project which requires the use of any land from a public park, recreation area, wildlife and waterfowl refuge, or historic site unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

8. There are differences but they are inconsequential. See footnote 9 infra.

lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance *as determined by the Federal, State, or local officials having jurisdiction thereof*, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge or historic site resulting from such use. [Emphasis supplied]

"This amendment of both relevant sections of law is intended to make it unmistakably clear that *neither* section constitutes a mandatory prohibition against the use of the enumerated lands, but rather, is a discretionary authority which must be used with both wisdom and reason. The Congress does not believe, for example, that substantial numbers of people should be required to move in order to preserve these lands, or that clearly enunciated local preferences should be

overruled on the basis of this authority." [9]

The emphasized language appears to us to change the duty of the Secretary under § 4(f). Until 1968 he was required to determine whether the statute covered the lands in question. Since that time he may rely upon a local official having jurisdiction for a determination whether publicly owned lands falls within a public park, recreation area, or wildlife and waterfowl refuge.[10]

■ Testimony of the witness Melvin J. Deale, District Engineer for the Department of Transportation, Federal Highway Administration established that the Department of Transportation made an inquiry to the Pennsylvania Highways Department as to whether the state-owned land was a public recreation area. On April 15, 1970, before approving the project, the Department received from the Highways Department an opinion letter (Exhibit P 60) from Robert W. Cunliffe, Deputy Attorney General as follows:

"The question has arisen as to whether the construction of L.R. 52001–A01, through certain lands of the Department of Forests and Waters and the General State Authority in Potter County falls under Section 138 of Title 23 U.S.C., the Act of September 13, 1966 or August 23, 1968 or Paragraph 4F.

9. Conference Report No. 1799, 90th Cong., 2d Sess., 3 U.S.Cong. & Admin.News 1968 at 3538. With the exception of its inclusion of a comma after the second use of the words "waterfowl refuge" 23 U.S.C. § 138 (1971) is identical to the proposed section printed above, 49 U.S.C. § 1653(f) (1971) is identical to the present 23 U. S.C. § 138 save the former's substitution of the words "[a]fter August 23, 1968" for the former's language, "[a]fter the effective date of the Federal-Aid Highway Act of 1968."

10. This is not to say that assuming the area is parkland the Secretary may rely upon a local preference as to its use. *See* Named Individual Members of the San Antonio Conservation Society v. The Texas Highway Department (5th Cir., filed

August 5, 1971) 446 F.2d 1013, at p. 102. "The question, therefore, is whether Congress intended to leave the choice between parks of local significance and federal-aid highways to local authorities; or whether Congress, in passing section 4(f), has already made the choice between the two uses. Only one construction fairly can be given to section 4(f), and that is that Congress itself has made the choice between the two uses. Clearly, Congress did not intend to leave the decision whether federal funds would be used to build highways through parks of local significance up to the city councils across the nation. If there was any doubt about this question before *Overton Park*, there most assuredly is no longer any doubt."

The land owned by the Department of Forests and Waters is not part of any State Park, nor is it recreation lands. It is, in fact, State forest land. There is a Sinnemahoning State Park, but that is located on the east of the First Fork Creek and to the north. Under the Act of May 5, 1921, P.L. 418, Section 1 (32 P.S. 131), State forest land can be sold or exchanged for other land when it would have a more valuable use for another purpose. Under the Act of April 9, 1929, P.L. 177, Section 1802 (71 P.S. 462), State forest land may be:

. . . 'set aside . . . for parks . . . or wildlife interests . . .'

"The fact that said lands remain State forest lands and have not been set aside for park, wildlife interests or recreation and may be sold when they have a more valuable use for another purpose clearly removes such lands from the purview of the aforementioned Federal Statutes.

As for the land owned by the General State Authority, that land is also not part of any public park and recreation lands, wildlife and waterfowl refuges and historic site. That land was acquired by General State Authority for flood control purposes.

Based on the above, you are advised that the plan on Potter County, L.R. 52001–A01, does not require the approval of the United States Secretary of Transportation."

The lands in question were owned by divisions of the Commonwealth. Not all land owned by the Commonwealth falls within the ambit of § 4(f). Under that statute as amended in 1968, whether public land is also a park, recreation area or wildlife reserve is to be determined by the appropriate federal, state or local officials having jurisdiction thereof. The Secretary obtained a ruling letter from the office of the Attorney General of the Commonwealth that the land in issue was not set aside for the purposes enumerated in § 4(f). He need hardly have insisted on an act of the legislature or an advisory opinion of the Pennsylvania Supreme Court. The Attorney General of Pennsylvania was the appropriate State official having jurisdiction over the land in question for purposes of making that determination,[10a] and the Secretary was not only entitled but even obliged, to accede to his ruling that the land was not set aside for park, or recreation uses. Thus the findings specified in § 4(f) were not required.

### III. The Rivers and Harbors Act of 1899

The Rivers and Harbors Act of 1899 provides, in part:

"It shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: . . ." 33 U.S.C. § 401 (1971). The district court did not reach the question whether the incursion of the road into Sinnemahoning Creek was a bridge, dam or causeway.[11] It found that the creek was not a navigable river or other navigable water of the United States. That finding is not clearly erroneous. Fed.R.Civ.P. 52(a).

### IV. The National Environmental Policy Act of 1969

The National Environmental Policy Act of 1969 (NEPA), one of a

10a. 71 Pa.Stat.Ann. § 192 (Purdons Supp. 1971).

11. 315 F.Supp. at 251–252. Compare Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970) affirming 302 F.Supp. 1083 (S.D.N.Y. 1969).

number of recent attempts by Congress to control the more destructive effects of man's technology on his environment,[12] requires "all agencies of the federal government . . . [to] include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on

(I) The environmental impact of the proposed action,

(II) Any adverse environmental effects which cannot be avoided should the proposal be implemented,

(III) Alternatives to the proposed action,

(IV) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(V) Any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

Act of Jan. 1, 1970, Pub.L.No. 91–190 § 102(2) (C), 42 U.S.C. 4332 (1971). The statute has been held to apply to the decisions of the Department of Transportation approving grants for the primary road system. Named Individual Members of the San Antonio Conservation Society v. The Texas Highway Department, (5th Cir., filed August 5, 1971) 446 F.2d 1013.

No case has come to our attention deciding whether a grant for a secondary system road pursuant to 23 U.S.C. § 117 is a "major federal action" within the

meaning of NEPA Section 102(2) (C). We do not reach that question here. The Secretary's action approving Pennsylvania's application took place on November 20, 1969, and construction contracts were awarded on December 29, 1969. The only duty remaining on the Secretary after November 20, 1969 was to make a final inspection of the project after construction. 23 U.S.C. § 117(c). For all practical purposes, therefore, final federal action on the project took place prior to January 1, 1970, the effective date of NEPA. There is no evidence of a congressional intention that the act be applied retroactively to reopen decisions which had become final before that date. Indeed the contrary intention may be inferred from the fact a grace period was incorporated in 42 U.S.C. § 4332.[13] This is not a case where discretionary federal administrative action takes place in stages, and some stages have taken place prior to January 1, 1970 while others remain. *Compare* Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, (D.C. Cir., filed July 23, 1971) 449 F.2d 1109. We hold that NEPA does not apply to this project since the Secretary's final approval took place prior to January 1, 1970.

### V. Sovereign Immunity

The district court on the authority of Citizens Committee for the Hudson Valley v. Volpe, 297 F.Supp. 809 (S.D.N.Y.1969), held that the defendant Bartlett, Secretary of the Pennsylvania Department of Highways, and the contractor defendants, were immune from suit since they are instrumentalities of the Commonwealth and hence within the sovereign immunity. While the conclusions which we have reached on the mer-

---

12. *See e. g.* Environmental Education Act, Act of Oct. 30, 1970, Pub.L. No. 91–516, 20 U.S.C. § 1532 (1971) ; Air Quality Act of 1967, Act of Nov. 21, 1967, Pub.L. No. 90–148, 42 U.S.C. 1857 et seq. (1971) ; Water and Environmental Quality Improvement Act of 1970, Act of Apr. 3, 1970, Pub.L. No. 91–224, 42 U.S.C. § 4372–74 (1971).

13. *But see* Texas Committee on Natural Resources v. United States, (W.D.Tex. 1970) dismissed as moot and vacated 430 F.2d 1315 (5th Cir. 1970), reprinted in O. Gray Cases and Materials on Environmental Law (1970) at 10.

its render that holding more or less academic, we suggest that the district court opinion on this issue is at least questionable. It is true that the rule of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) has not been extended to situations where effective relief would require the expenditure of state funds. Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Cf.* Missouri v. Fiske, 290 U.S. 18, 26, 54 S.Ct. 18, 78 L.Ed. 145 (1933). But a state may, by engaging in activities of paramount federal interest, waive its immunity under the eleventh amendment. Parden v. Terminal Ry., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); Petty v. Tennessee-Missouri Bridge Commission, 359 U.S. 275, 79 S.Ct. 275, 3 L.Ed.2d 804 (1959). Whether such a waiver has taken place is a question of federal law. Parden v. Terminal Ry., *supra,* at 194–196, 84 S.Ct. 1207; Chesapeake Bay Bridge Terminal District v. Lauritzen, 404 F.2d 1001, 1003–1004 (4th Cir. 1968); S. J. Groves & Sons v. New Jersey Turnpike Authority, 268 F.Supp. 568, 571–572 (D.N.J.1967). In Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, *supra,* the State defendants argued that even though the court could prohibit federal expenditures for the disputed parkland road project it should be free to pursue the project solely as a State project and at State expense. Judge Thornberry rejected this contention, saying at p. 1028 of 446 F.2d:

"No one forced the State to seek federal funding, to accept federal participation, or to commence construction of a federal aid highway. The State, by entering into this venture, voluntarily submitted itself to federal law. It entered with its eyes open, having more than adequate warning of the contro-

versial nature of the project and of the applicable law. And while this marriage between the federal and state defendants seems to have been an unhappy one, it has produced an already huge concrete offspring whose existence it is impossible for us to ignore. (footnote omitted) In short, the state, as well as the federal defendants must compy with the law in the completion of the North Expressway."

Much the same can be said about the sovereign immunity contention. It seems unlikely that having undertaken to apply for participation in the federal primary, secondary or interstate road systems a state can, if it decided the federal law is too onerous, attempt to withdraw and assert the defense that its actions are beyond challenge in a federal court.[14] But we leave that issue for definitive determination in a later case, with the caveat here that our affirmance in this case is not to be construed as an approval of the district court's sovereign immunity holding.

### VI. Standing and Laches

The district court's opinion applied the proper legal standards in determining that the plaintiffs had standing to sue. The findings of fact made in support of the court's conclusion that the plaintiffs were not guilty of laches are not clearly erroneous. Fed.R.Civ.P. 52(a). In any event, in view of our disposition on the merits these rulings are not critical.

### VII. Mootness

We made reference above to the affidavit dated October 15, 1971 disclosing that by September 3, 1971 Route 872 was completed and opened to traffic. No formal motion to dismiss the appeal was presented, but we have considered

---

14. As Judge Thornberry points out in the *San Antonio* case, in many states road expenditures are at a level at which all available federal matching funds will be absorbed, and the shift of a grant from a non-qualifying to a qualifying project may impose no real financial burden. Recognition of the power of states to make such shifts immune from federal judicial review might result in a serious erosion of the effectiveness of the new federal statutes aimed at protecting the environment.

the filing of the affidavit as a suggestion of mootness, which we reject. If we found that a violation of the federal statutes relating to the protection of the environment had taken place, the fact that the road was complete would not necessarily preclude the possibility of an equitable decree making right some part of the wrong. *See e. g.*, Wildlife Preserves, Inc. v. Volpe, 443 F.2d 1273 (3d Cir. 1971); Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809, 822 (3d Cir. 1971).

The Judgment of the district court will be affirmed.

Mulligan, Circuit Judge, concurred and filed opinion.