Carl A. PETTERSON et al., Plaintiffs,

v.

Robert S. FROEHLKE, Individually and as Secretary of the Army of the United States, et al., Defendants, and The Port of Portland, a municipal corporation, Intervener-Defendant.

Civ. No. 71–283.

United States District Court,
D. Oregon.

Nov. 29, 1972.

Marvin B. Durning, Durning, Prince & Smith, Seattle, Wash., for plaintiffs.

Sidney I. Lezak, U. S. Atty., Jack G. Collins, First Asst. U. S. Atty., Portland, Ore., for defendants.

Lofton L. Tatum, Donald J. Morgan, Wood, Wood, Tatum, Mosser & Brooke, Portland, Ore., for intervener-defendant.

## OPINION

SOLOMON, District Judge:

Plaintiffs are Washington citizens who own real property on or near the Columbia River (River) in Clark County, Washington. They object to the proposed $170 million expansion of the Portland International Airport (Airport) by the Port of Portland (Port), the construction of the I-205 bridge across the River, and the construction of a segment of Highway I-205.

In a prior decision in this case, I held that plaintiffs have standing to maintain this action and that there was no merit to plaintiffs' claim that the Port was required to obtain congressional authorization for the project. Petterson v. Resor, 331 F.Supp. 1302 (D.Or.1971).

Plaintiffs' other objections are now before the court.

A history of the Port's expansion plan will be helpful to understand the issues.

The Port has made a number of piecemeal additions to the Airport to accommodate increasing passenger travel and air cargo. The Port has also been troubled by a shortage of land to permit commercial and industrial development at the Airport.

In 1967, the Port concluded that it should either build a large new airport at another site or enlarge the existing airport facilities by separating the runways by at least 5,000 feet. The Port and the Columbia Regional Association of Governments considered 25 sites where a new airport might be built. Each site presented serious problems. The Port finally decided that the public interest would be served best if it expanded the present airport.

To achieve greater runway separation, the Port could either move the south runway farther south, or it could move the north runway farther north. Moving the runway to the south would intrude into the residential Parkrose area of Portland, and it would create serious problems with the U. S. military, which uses land south of the Airport. There-fore, the Port decided that the best alternative was to expand to the north by filling in part of the Columbia River. The Port intends to secure financial assistance for the project from the Federal Government.

The Port has already obtained title to Sand, McGuire and Government Islands, all of which lie in the River near the Airport. The northward expansion plan contemplates that the Port will fill in 640 acres of the River and will remove all of Sand Island and parts of Lemon and Government Islands.

The proposed I-205 highway and bridge would carry some Airport traffic, but neither is an integral part of the Port's expansion plan. The proposed fill would save more than $20 million because it would reduce the number of pilings necessary for the bridge.

The Port started to obtain administrative approval for its plan more than three years ago. On February 14, 1969, the Federal Aviation Administration (FAA) found that the proposed runway changes would be "safe and efficient." On July 11, 1969, the Secretary of Transportation (Secretary) approved the Airport expansion in a Department of Transportation news release. On August 5, 1969, the Corps of Engineers (Corps), acting for the Secretary of the Army, issued a dredge and fill permit. On December 23, 1969, the FAA approved the proposed Layout Plan for the Airport, and, on September 17, 1971, the FAA approved a revised Layout Plan.

The administrative history of the I-205 highway and bridge projects commenced even earlier. On March 7, 1966, the Federal Highway Administration (FHA) approved the corridor for the project. On April 18, 1969, the FAA found that the highway and bridge would not threaten air traffic. On February 18, 1970, the Secretary approved the highway, and on May 15, 1970, the bridge. On May 20, 1970, the Coast Guard granted a permit for the bridge to cross the River. And on January 27, 1971, the FHA approved the design of

the bridge and the Oregon portion of the highway.

Several federal environmental laws were enacted since the Airport and I-205 projects were started. The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347 (NEPA), is the most important. NEPA requires federal agencies to make environmental impact studies before they can take major actions. Other laws require the Secretary to make special environmental determinations. Section 16 of the Airport and Airway Development Act of 1970, 49 U.S.C. § 1716 (Airport Act), requires the Secretary to find that all steps have been taken to minimize the environmental effects of an airport construction project before he grants the project federal assistance. Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f) (Transportation Act), requires the Secretary to make a similar determination before he approves any project that uses a publicly owned park, recreation land, or a similar area.

The Port has agreed not to perform any substantial work on the Airport until the Federal Government approves the project on the basis of impact studies now in preparation. These studies are investigating whether the Airport should be expanded and, if so, whether it should be expanded into the River. These studies are also investigating the impact of the proposed expansion on 22 different environmental variables like noise, wildlife, air quality, and aesthetics. The Port asserts that these studies will satisfy the requirements of NEPA and will give the Secretary an adequate basis to fulfill his duties under Section 16 of the Airport Act and Section 4(f) of the Transportation Act.

Similar studies are being made for the I-205 highway and bridge. The FHA has agreed to withhold authorization for their construction until the Secretary approves the impact statement and makes a new 4(f) determination. These studies will investigate and report on the impact of I-205 on the natural and urban environments, on alternatives to the project, and on ways to minimize the environmental impact of the project.

Plaintiffs fear that the Airport expansion will create both congestion and noise and will pollute the atmosphere. Plaintiffs also believe that dredging will impair the recreational and wildlife value of the area and will lead to erosion of the riverbank. Plaintiffs ask the court to declare invalid the dredging permit and every other federal agency action for the Airport expansion. They also challenge all the federal agency actions on I-205.

Although the Port has agreed to proceed only if the impact studies are favorable, plaintiffs are not satisfied with this offer. Regardless of whether the studies are favorable, plaintiffs want the Port and the other agencies to set aside all past decisions and seek new authorizations. They want the agencies to hold new public hearings and to make new decisions on the basis of the impact studies, the information the plaintiffs have, and any other information the public might offer. Plaintiffs believe the Port should proceed only if this information, when considered anew, showed that the project was in the public interest.

It has been difficult to evaluate plaintiffs' claims because many of their arguments have been neither organized nor relevant. Plaintiffs have made many allegations of environmental harm and illegal administrative action, but their trial brief has frequently failed to relate their allegations to the legal issues.

Most of the controversy focuses on the dredging permit.

Plaintiffs first contend that NEPA is retroactive and that the permit is invalid because it was issued without an impact statement.

The Corps issued the permit on August 5, 1969, and NEPA went into effect on January 1, 1970. NEPA applies to a continuing project begun before January 1, 1970, only if the project requires major action by a federal agen-

cy after that date. Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971); Calvert Cliffs' Coordinating Committee, Inc. v. U. S. AEC, 146 U.S.App.D.C. 33, 449 F. 2d 1109 (1971). Since the Corps had to perform no such actions after issuing the permit, NEPA does not affect the permit. Greene County Planning Board v. FPC, 455 F.2d 412, 424 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L. Ed.2d 90 (1972); Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613 (3d Cir. 1971).

█ Plaintiffs contend that the permit violates Corps regulations and 33 U.S.C. § 403 because the Corps did not adequately consider the environmental consequences of the dredging. Plaintiffs are particularly critical of the way the Corps evaluated the threat of erosion. The Corps relied on a mathematical simulation of the river currents. Plaintiffs assert that a hydraulic simulation was necessary.

I do not agree with these contentions. Corps regulations and Section 403 do not require the board, detailed reports required by NEPA. The Corps here adequately investigated the problems it was obligated to consider.

█ Plaintiffs also allege that the permit violates Corps regulations because it does not adequately describe the dredging plan and because the Corps approved some minor changes in the permit on September 17, 1970, without public notice or a public hearing. There is no merit in these contentions. 33 C.F.R. §§ 209.130(b) & (j).

The Under Secretary of the Interior stated in a letter to the Corps that he had no objection to the Port's plan. Plaintiffs assert that this letter was written without sufficient consideration of the environment and, therefore, that the permit issued by the Corps is void. Plaintiffs also assert that the permit is void because the Secretary of Transportation's 4(f) determination for the Airport was illegal.

█ I reject both of these contentions. Plaintiffs have spent considerable effort trying to show that these administrative actions were illegal, but they have failed to show any way in which these actions could affect the validity of the dredging permit, which is independent of the other administrative actions.

█ Next plaintiffs contest the permit on the ground that the islands were transferred to the Port in violation of the Wildlife Restoration Act, as amended, 16 U.S.C. §§ 669 to 669g–1. The islands were transferred legally. And here again, even if the islands were transferred illegally, plaintiffs have failed to show how that fact could affect the validity of the dredging permit.

█ In 1805, Lewis and Clark camped overnight on Government Island, and other small sections of the Lewis and Clark Trail and the Oregon Trail are near the Airport. The National Trails System Act of 1968, 16 U.S.C. §§ 1241–1249, requires the Secretary of Interior to prepare studies of these trails before Congress decides whether to designate them "national scenic trails". These studies have not been completed. Plaintiffs assert that no federal agency can authorize work that will affect these trails in any way until Congress makes this decision.

I disagree, and I am confident that Congress did not intend to immunize the land along these trails from any change, no matter how slight or remote.

█ Plaintiffs allege that the Corps of Engineers violated the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470–470n. They also allege that the act invalidates all other agency actions that have been taken. Specifically, plaintiffs assert that the Airport expansion, bridge, and highway will affect the Fort Vancouver National Historic Site, which is one of the historic sites protected by the act.

The Fort Vancouver National Historic Site is near the Columbia River more than 10 miles from the Airport. It consists primarily of a small museum commemorating Fort Vancouver, a fur-trad-

ing post established by the Hudson's Bay Company in 1824.

It is inconceivable that the act invalidates the action of the Corps of Engineers. Nor do I believe that the increased air and auto traffic will disturb the site to such an extent that other agencies fall within the restrictions of the act.

■ Plaintiffs' attacks on the Secretary of Transportation's 4(f) determinations are moot because the Secretary has agreed to make new determinations.

Plaintiffs' attacks on other pre-NEPA administrative decisions are groundless. NEPA does not require that the agencies start over and make new decisions, and plaintiffs have shown no other grounds which invalidate these actions.

■ Plaintiffs have also failed to show that the post-NEPA actions are invalid, even though made without impact statements. The FHA design approval for I–205 and the Coast Guard permit for the bridge were both made under authority delegated to these agencies by the Secretary of Transportation. Their decisions will be reexamined when the Secretary evaluates the impact studies and makes his new Section 4(f) and Section 16 determinations. Moreover, the decisions of the Coast Guard and the FHA were small, isolated parts of a much broader administrative process. There was no need for these agencies to make a comprehensive environmental review prior to their decisions. Calvert Cliffs' Coordinating Committee, Inc. v. U. S. AEC, *supra,* 449 F.2d at 1119, 1128.

I find that the agencies are complying with federal law. The Port of Portland has and is taking all steps necessary to obtain the authorizations to expand the Airport.

Plaintiffs' action for a declaratory judgment invalidating the agency decisions and for other relief is dismissed.

This opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).