**NATIONAL WILDLIFE FEDERATION and Mississippi Wildlife Federation, Plaintiffs,**

v.

**William T. COLEMAN, Secretary, Department of Transportation, et al., Defendants.**

**Civ. A. No. J75–129(N).**

United States District Court,
S. D. Mississippi,
Jackson Division.

Aug. 4, 1975.

A. Spencer Gilbert, III, Jackson, Miss., Robert J. Golten, National Wildlife Federation, Washington, D.C., for plaintiffs.

Frank E. Shanahan, Jr., Asst. Atty. Gen., Jackson, Miss., Joe E. Brown, Asst. U.S. Atty., Robert E. Hauberg, U. S. Atty., Jackson, Miss., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NIXON, District Judge.

The Plaintiffs in this action brought suit under Section 4(f) of the Department of Transportation Act (49 U.S.C. § 1653(f)) and Section 7 of the Endangered Species Act (16 U.S.C. § 1536), seeking to halt the construction of a segment of Interstate Highway Route 10 (I–10) through the habitat of the Mississippi Sandhill Crane in Jackson County, Mississippi. A full hearing on the merits was combined with a hearing on the Plaintiffs' Request for a Preliminary Injunction. Based upon all of the evidence adduced at this bench trial, this Court makes the following Findings of Fact and reaches the following Conclusions of Law as required by Rule 52, F. R.Civ.P.

### FINDINGS OF FACT

I–10 is a route designated by Congress as a part of the National System of Interstate and Defense Highways, connecting Jacksonville, Florida, on the east through designated intermediate control points, with Los Angeles, California on the west. In Mississippi, I–10 will be 77.1 miles long. As of now, I–10 has been substantially completed from the Mississippi-Louisiana line, through Hancock and Harrison Counties, to a point in Jackson County, Mississippi

where it intersects with State Highway 57. From the intersection with Highway 57, I–10 will extend in an easterly direction approximately 18.9 miles to the Alabama line. The controversy in this suit relates to a portion of I–10 which is approximately 5.7 miles in length, extending in an easterly direction from its intersection with Highway 57 to the west bank of the Pascagoula River.

I–10 is being constructed by the Mississippi Highway Department, with Federal funding of 90% of the cost incurred, under the provisions of the Federal-Aid Highway Act, as amended, Title 23, United States Code.

The Mississippi Sandhill Crane, *Grus canadensis pulla*, was listed as an endangered sub-species on June 4, 1973, at 38 Fed.Reg. 14678, pursuant to Section 3 of the Endangered Species Act of 1969, P.L. 91–135, Dec. 5, 1969 (former Section 668cc–3, Title 16, United States Code), now repealed and replaced by the Endangered Species Act of 1973, P.L. 93–205, Dec. 28, 1973, 87 Stat. 884. There remain in existence approximately forty Mississippi Sandhill Cranes. The sole habitat of this endangered species is an area of some 40,000 acres in Jackson County, Mississippi, generally bounded on the west by the Harrison County line, on the north by an east-west line running a short distance north of the Vancleave community, on the east by the Pascagoula River, and on the south by the Mississippi Sound or Gulf of Mexico. I–10 has already been constructed in a west-east direction slightly more than half way through the aforesaid crane habitat to its intersection with Highway 57.

A Mississippi Sandhill Crane refuge in Jackson County, consisting of two separate units, has been proposed by the U. S. Fish and Wildlife Service. A part of this proposed refuge has already been acquired by the Nature Conservancy, a private organization, under an agreement whereby the Service will reimburse the Conservancy when and if it receives sufficient appropriations from Congress. The western unit (Ocean Springs) of the refuge abuts the section of I–10 which is soon to be completed to its intersection with Highway 57. The portion of I–10 which is the subject of this suit runs directly through the habitat of the Crane and will bisect the eastern unit (Fountainbleu) of the proposed refuge. The alignment of this project traverses Sixteenth Section land presently held by the Jackson County School District and also cuts through Fifteenth Section land held by the Nature Conservancy for the proposed refuge.

This segment of I–10 has been under consideration since 1963. At the time that this action was instituted, all of the right-of-way for I–10 between State Highway 57 and the Pascagoula River had been acquired, with most of it having been purchased prior to 1970.

A draft environmental impact statement was approved by the Federal Highway Administration and circulated on October 29, 1974. A final environmental impact statement was approved by the Federal Highway Administration on March 10, 1975, and submitted to the Council on Environmental Quality on March 13, 1975. On March 21, 1975, the Plaintiff, National Wildlife Federation, through its counsel, wrote the defendant, Tiemann, the Federal Highway Administrator, expressing opposition to the project because of alleged violations of Section 7 of the Endangered Species Act and Section 4(f) of the Department of Transportation Act. A copy of that letter was sent to the Department of Interior's Director of Fish and Wildlife Service, its Solicitor's Office, and the Department's Office of Environmental Affairs.

On April 30, 1975, approval of plans, specifications and estimates for the 5.7 miles of the project was given by the defendant, Shaw, pursuant to 23 U.S.C. § 106(a), which constituted a final action by the Federal Highway Administration obligating the United States to participate in the cost of the project.

On May 23, 1975, plaintiffs filed this suit.

A contract was let by the Mississippi Highway Department for the construction of this segment of highway on May 27, 1975, subject to the approval of the award by the Federal defendants. Submission of the contract to the Federal defendants for their approval and action has been temporarily suspended pending the trial of and decision in this action.

On June 25, 1975, the eve of the trial of this action, the Department of Interior made an emergency determination that the Mississippi Sandhill Crane's habitat traversed by this highway project is "critical" under Section 7 of the Endangered Species Act, and was about to be so designated in the *Federal Register*. On June 30, 1975, this designation was in fact published at 40 Fed.Reg. 27501.

## CONCLUSIONS OF LAW

### A. JURISDICTION

Plaintiffs allege that this Court has jurisdiction of this controversy under Section 4(f) of the Department of Transportation Act [1] and Section 7 of the Endangered Species Act.[2] We first consider whether Section 4(f) of the Department of Transportation Act has any applicability to the present controversy. In making this determination the key issue which the Court must consider is whether this project "requires the use of any publicly owned land from a public park, recreation area, or wildlife and water fowl refuge of national, State or local significance".

■ The plaintiffs urge that Section 4(f) does apply, since a portion of the project in question traverses Sixteenth Section land, which is owned by the Jackson County School District, thereby making the land "public land", and because the entire project will cross land which is being used as a "de facto" refuge by the Cranes and which is proposed as an official refuge therefor. The Court finds this contention unconvincing. I–10 simply will not use any "publicly owned land from a public park, recreation area, or wildlife and water fowl refuge of national, State or local significance" in Jackson County, Mississippi.

In *Pennsylvania Environmental Council, Inc. v. Bartlett*, the plaintiffs brought suit to enjoin the planned relocation of a highway and to prevent the use of Federal funds for the project. A portion of the proposed project paral-

---

1. "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public parks and recreation lands, wildlife and water fowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the land traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and water fowl refuge of national, State or local significance as determined by the Federal, State or local officials having jurisdiction thereof, or any land from an historic site of national, State or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and water fowl refuge, or historic site resulting from such use." 49 U.S.C. § 1653(f).

2. " . . . all other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary [of Interior], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitats of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical." 16 U.S.C. § 1536.

leled and traversed an area of the Susquehanna River watershed used as a recreation area by sports fishermen. The relocated route lay entirely within land owned by the Pennsylvania Department of Forest and Waters and the general state authority of the Commonwealth of Pennsylvania. In response to an inquiry of the Pennsylvania Highway Department, the Deputy Attorney General of Pennsylvania ruled "The fact that said lands remain State forest lands and have not been set aside for park, wildlife interests or recreation and may be sold when they have a more valuable use for another purpose clearly removes such lands from the purview of the aforementioned Federal Statutes. [Section 4(f) and other statutes not pertinent here.] " The Third Circuit ruled that the fact that the appropriate state official had determined the lands in question not to be covered by Section 4(f) was determinative. "Under [Section 4(f) of the Department of Transportation Act] whether public land is also a park, recreation area or wildlife reserve is to be determined by the appropriate federal, state or local officials having jurisdiction thereof." *Pennsylvania Environmental Council, Inc. v. Bartlett*, 454 F.2d 613, 623 (3rd Cir. 1971). See also *Citizens Environmental Council v. Volpe*, 484 F. 2d 870 (8th Cir. 1973), *cert. den.* 416 U. S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Daly v. Volpe*, 350 F.Supp. 252 (D.Wash.1972).

■ In this case the office of the Attorney General of the State of Mississippi has determined that the lands in question are not "publicly owned lands from a public park, recreation area, or wildlife and water fowl refuge" within the meaning of Section 4(f) of the Department of Transportation Act. (See State defendant's Findings of Fact and Conclusions of Law, pp. 11-18.) This determination having been made, the Secretary of Transportation is bound by it and may not seek to apply Section 4(f). See *Pennsylvania Environmental Council v. Bartlett, supra.* Therefore,

Section 4(f) of the Department of Transportation Act provides no jurisdictional basis for this suit.

The Court reaches a different result, however, in its consideration of Section 7 of the Endangered Species Act (16 U. S.C. § 1536). This section mandates that all Federal agencies shall use their authority to assure that actions taken by them "do not jeopardize the continued existence of . . . endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary [of Interior] . . . to be critical." (16 U.S.C. § 1536). Another section of the Act, 16 U.S.C. § 1540(g), authorizes any person to commence a civil suit on his own behalf to compel compliance with the provisions of the Act. The section further provides that "[t]he district court shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, as the case may be."

■ Section 1540(g) requires, however, that before any suit is commenced, sixty days written notice of the alleged violation must be given to the Secretary of the Interior. The Federal defendants allege that the plaintiffs have failed to provide the Secretary with the required notice. This Court finds otherwise.

On March 21, 1975, the plaintiff, National Wildlife Federation, wrote to the defendant, Tiemann, expressing its opposition to the project and alleging violations of both Section 7 of the Endangered Species Act and Section 4(f) of the Department of Transportation Act. (Exhibit FD-1(39)) Copies of that letter were sent to three different offices within the Department of the Interior. It is true, as the Federal defendants argue, that this letter does not specifically purport to be the notice required by 16 U.S.C. § 1540(g), but this section does not require the notice to be in any particular form. The Court is convinced that the letter of March 21 was sufficient to place the Secretary of Interior

on notice of the alleged violations of Section 7.

■ The Federal defendants further contend that Section 7 is not applicable because the Secretary of the Interior has not properly determined the area in question to be "critical habitat" of the Crane, that is, that the "Emergency Determination of Critical Habitat for the Mississippi Sandhill Crane" was not made in compliance with the Secretary's own rules and regulations. Subsequent to the trial of this matter the Secretary did cause this determination to be properly published in the *Federal Register*, and the emergency determination has not been shown to be in derogation of the Secretary's regulations. In a matter of this nature, where time is of the essence, a decision on the merits should not be delayed because of a possibility that the Secretary has committed a technical violation of his own regulations, which are admittedly still in the formative stage.

■ For the above reasons the Court finds that it does have jurisdiction of this cause under Section 7 of the Endangered Species Act.

### B. STANDING

■ The Endangered Species Act at 16 U.S.C. § 1540(g) confers automatic standing on any person claiming a violation thereof. The Secretary of the Interior and the alleged violator must be given notice sixty days before suit is filed (16 U.S.C. § 1540(g)(2)(A)), but as was pointed out above, the plaintiff's March 21, 1975 letter to the defendant, Tiemann, with copies to three offices in the Department of the Interior, met this notice requirement. Thus, plaintiffs clearly have standing under the "citizens suit" provision of the Endangered Species Act.

■ In addition, plaintiffs are persons "aggrieved" under Section 10 of the Administrative Procedure Act (5 U.S.C. § 702) because of alleged violations of Section 7 of the Endangered Species Act (16 U.S.C. § 1536). Both plaintiff organizations allege "injury in fact" to their members, and, as visitors and users of the Mississippi Sandhill Crane habitat, are within the "zone of interest" intended to be protected by the statute. Having alleged such injuries, the plaintiff organizations clearly have standing to bring this action. See *United States v. SCRAP*, 412 U.S. 669, 689–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *cf., Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).

### C. LACHES

■ The defendants claim that plaintiffs may not now assert their present claims, but as a matter of equity, are barred by the doctrine of laches. The Fifth Circuit has only recently dealt with the laches issue in *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir., 1975), in which the Court pointed out that "[t]here are three independent criteria which must be met before the equitable doctrine of laches can be applied, the defendant must show a delay in asserting a right or claim, the delay was not excusable and there was undue prejudice to the party against whom the claim is asserted." (Citation omitted). *Ecology Center of Louisiana, Inc. v. Coleman, supra.* There has been no showing that the plaintiffs in this case were guilty of any undue delay in asserting their rights or claims herein. Final approval of "plans, specifications and estimates" for the project in question was given on April 30, 1975 by the defendant, Shaw. This was the critical Federal action committing the Federal government to participate in the project. *See, e. g. Steubing v. Brinegar*, 375 F. Supp. 1158, 1162 (W.D.N.Y.1974). Since the plaintiffs filed this suit only three weeks after the formal Federal commitment to the project, they certainly are not guilty of laches.

## D. MERITS OF THE CONTROVERSY

 Having considered the threshold issues of jurisdiction and standing and the affirmative defense of laches raised by the defendants, we now reach the merits of the controversy. At the outset, the Court notes that the plaintiffs bear the burden of establishing the illegality of the defendants' actions. *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d 613, 619 (3rd Cir. 1971); *Lewes Dairy, Inc. v. Freeman,* 401 F.2d 308, 316 (3rd Cir. 1968), *cert. den.* 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969). In order to prevail in this action, the plaintiffs must show that the I–10 project in question will jeopardize the continued existence of the Mississippi Sandhill Crane or result in the destruction or modification of its habitat. The plaintiffs have failed to meet this burden.

The Court is aware that the record in this case includes a number of letters which allege that the I–10 project in question will adversely affect the Crane. Indeed, the environmental impact statement prepared by the defendants, which is an exhibit in this case, admits that I–10 may be a threat to its existence. For the most part, however, these documents merely reflect opinions of the effect of the highway on the Crane without specifying facts upon which they are based. Furthermore, most in all candor admit that the opinions expressed are merely speculation.

The evidence which the Court finds persuasive is the testimony given at the trial of this cause by the plaintiffs' own expert witness, Jacob M. Valentine, Jr., biologist with the U. S. Fish and Wildlife Service, who was acknowledged by all parties to be this country's foremost expert on the Mississippi Sandhill Crane. It was Mr. Valentine who in September, 1963, admittedly with only a brief experience in studying the Cranes, reported to the Mississippi Game and Fish Commission that the major problems confronting the Crane at that time were drainage and poor timber management practices,[3] and that the Crane could tolerate the loss of habitat and disturbance from the I–10 highway alignment. His report further pointed out "there are some advantages to the interstate highways in that they effectively block cross traffic through remote areas such as this. The right-of-ways are fenced eliminating general trespass. The highways, especially if provided with rest stops, would provide opportunity for the bird-watching, nature-loving public to view the rare birds and the flora." (Exhibit FD–1(1)).

The testimony of Mr. Valentine at the hearing of this matter was extensive, consuming some eighty-seven pages of the transcript. Throughout his testimony, Valentine repeatedly stated that the main threats to the continued existence of the Mississippi Sandhill Crane are poor timber management, housing and industrial development of the area comprising its habitat, and I–10, in that order. (Transcript, pages 44–45, 82).

Mr. Valentine's testimony clearly indicates that the Mississippi Sandhill Crane can tolerate the direct effects of I–10. He admits that the project will take only approximately 300 acres of the 10,000 acres comprising the habitat of the Crane (Transcript, p. 56), and that the remaining acreage of habitat will be adequate to allow space for its normal growth, movement and territorial behavior, to meet its nutritional requirements, and to preserve adequate breeding sites, cover and shelter for the present bird population.

When asked about the sensitivity of the Sandhill Crane to disturbance, Mr. Valentine admitted that he had conducted no experiments to make this determination. He was of the opinion, however,

---

**3.** St. Regis Paper Co. has promised future cooperation with the Fish and Wildlife Service by instituting timber management practices in the area to improve the Cranes' habitat.

that the bird preferred isolation and that the noise and continuous traffic on the highway would cause them to flush from their nests, possibly endangering eggs in the nest. He admitted, however, that a primary method which he uses in estimating the population of the birds is flying over nests in helicoptors and airplanes, causing the birds to flush from their nests. His testimony showed no concern that this flushing endangers eggs in the nest. (Transcript, pp. 77–79).

Considered as a whole, the essence of Mr. Valentine's testimony is that the only real danger presented to the Sandhill Crane by I–10 is private development which may accompany or occur in the area of the highway. But the record in this case is totally devoid of any statement or opinion rising above mere speculation to indicate that such development will occur or is even likely to occur. This is particularly true with respect to the interchange at the intersection of I–10 and Earl Bond Road, about which the plaintiffs specifically complain. The land surrounding the proposed project is depicted to this Court as low lying, marshy land totally unsuited for commercial development. In addition, the record contains several references to a program under which the Nature Conservancy is engaged in purchasing and holding land within the Crane's habitat, hopefully for the future establishment of a Mississippi Sandhill Crane refuge. This program is providing and will continue to provide a further buffer for the crane against private development. In its notice of intention to determine "critical habitat" for 108 endangered species, including the Mississippi Sandhill Crane, published in the *Federal Register* on May 16, 1975, the U. S. Fish and Wildlife Service noted, "There may be many kinds of actions which can be carried out within the 'critical habitat' of a species that would not . . . adversely affect that species" and are therefore not inconsistent with Section

7. (40 *Fed.Reg.* 21499). The evidence clearly shows that the construction of I–10 through Jackson County, Mississippi falls within this description.

It is obvious from the record in this case that the defendants have not been callous in their planning of this project and the consideration of its impact on the Crane. The environmental impact statement prepared by the defendants devotes several pages to the Crane, the effect of the highway upon it, and steps which will be taken to lessen the impact, if any, of the highway. The route of the highway has clearly been chosen to pass through the smallest part of the Crane's habitat and nesting area. The record contains a number of references to steps which the defendants are requiring contractors on the project to take in order to lessen the impact of construction on the Cranes. It appears to the Court that the defendants have adequately considered the effects of this project on the Crane in all phases of its planning.

## CONCLUSION

The Court finds that it has jurisdiction of this controversy under Section 7 of the Endangered Species Act, though not under Section 4(f) of the Department of Transportation Act. The plaintiffs have standing to bring suit under Section 7, and they have not been guilty of any laches in bringing their claim before this Court. However, the plaintiffs have failed to prove that they are entitled to any relief under the aforementioned statute. In short, based upon all of the evidence of record, there is room in the area in question for the lanes and the Cranes.

A final judgment conforming with the above Findings of Fact and Conclusions of Law, approved as to form by attorneys for both sides, shall be presented to this Court within the time and manner prescribed by the rules hereof.