NATIONAL WILDLIFE FEDERATION
et al., Plaintiffs-Appellants,

v.

William T. COLEMAN, Secretary of
Transportation, et al.,
Defendants-Appellees.

No. 75–3256.

United States Court of Appeals,
Fifth Circuit.

March 25, 1976.

Rehearing and Rehearing En Banc
Denied May 19, 1976.
Rehearing Denied June 11, 1976.

A. Spencer Gilbert, III, Jackson, Miss., Robert J. Golten, Natl. Wildlife Fed., Washington, D. C., for plaintiffs-appellants.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., A. F. Summer, Atty. Gen. of Miss., Jackson, Miss., Walter Kiechel, Jr., Asst. Atty. Gen., Washington, D. C., Frank E. Shanahan, Jr., Asst. Atty. Gen. of Miss., Ed Davis Noble, Jr., Jackson, Miss., Brent Ward, General Litigation Sec., Land & Natural Resources Div., Dept. of Justice, Wallace H. Johnson, Larry A. Boggs, George R. Hyde, Attys., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before THORNBERRY, SIMPSON and MORGAN, Circuit Judges.

SIMPSON, Circuit Judge:

Appellants, National Wildlife Federation (NWF) and Mississippi Wildlife Federation (MWF), brought this action in the court below seeking declaratory relief and to enjoin the construction of a 5.7 mile section of Interstate Highway Route 10 (I–10)[1] through Jackson County, Mississippi, which would traverse the habitat of the Mississippi Sandhill Crane (Grus canadensis pulla) an endangered sub-species. Count I of the complaint alleged that construction of this segment of I–10 and of an interchange at the Earl Bond Road (also known as the Gautier-Vancleave Road) would threaten the continued existence of the crane and would result in the destruction and modification of its critical habitat in violation of Section 7 of the Endangered Species Act of 1973, Title 16, U.S.C., Section 1536 (hereinafter § 7). Count II alleged a violation by appellee Coleman, Secretary of Transportation, of Section 4(f) of the Department of Transportation Act, Title 49, U.S.C., Section 1653(f) (hereinafter § 4(f)), in that he had not determined that there is no feasible and prudent alternative to the construction of the highway as located and designed, and that all appropriate measures to minimize the harm to the habitat of the crane have been planned. The appellants requested that construction of the 5.7 mile section of I–10 be enjoined until (i) modifications are made to insure that the proposed segment will not jeopardize the continued existence of the Mississippi Sandhill Crane, or destroy or modify habitat critical to the crane, and (ii) appellee Coleman makes the findings required under § 4(f). Appendix A hereto is a map of the area.

After a hearing on the merits combined with a hearing on appellants' Request for a Preliminary Injunction, F.R. Civ.P., Rule 65(a)(2), the district court entered an order dismissing the complaint. *National Wildlife Federation v. Coleman*, S.D.Miss.1975, 400 F.Supp. 705. The district court held that the determination by the Office of the Attorney General of the State of Mississippi on the nonapplicability of § 4(f) was binding on the Secretary of Transportation, and, therefore, that § 4(f) provided no jurisdictional basis for the suit. *Id.* at 709. The court further held that although it had jurisdiction under § 7, the appellants had failed to meet their burden of proving a violation of that section since the project in controversy would not jeopardize the continued existence of the Mississippi Sandhill Crane or result in the destruction or modification of its habitat.

1. Federal Project No. I–10–1(25)57; State Project No. 51–0010–01–025–10.

The NWF and MWF filed a notice of appeal on August 24, 1975, and on August 20 filed a motion for an injunction pending appeal. On September 10, 1975, we ordered the appeal expedited and directed that the motion for injunction be carried with the case. Following oral argument on December 9, 1975, we enjoined appellees until further order from (a) initiating or carrying out any further work or incurring any further contractual obligations with respect to the interchange at the Earl Bond Road; and (b) excavating any borrow pits in Sections 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22, 23, and 37 of Township 7 South, Range 7 West, of the lands involved in this appeal. This order was to remain in effect pending this decision on the merits and the disposition of any petitions for rehearing hereafter filed.

After examination of the record, we hold that the requirements of Section 7 of the Endangered Species Act of 1973 were not complied with by the appellees. We reverse the trial court and remand the cause for further proceedings.

## BACKGROUND

I–10, part of the National System of Interstate and Defense Highways, Title 23, U.S.C., Section 101(b), is a limited access highway across the southern United States which when completed will extend from Los Angeles, California, to Jacksonville, Florida. In Mississippi I–10 will be approximately 77.1 miles long traversing Hancock, Harrison, and Jackson Counties, and is being constructed with 90% federal financing pursuant to the Federal-Aid Highway Act, Title 23, U.S.C., Section 101 *et seq*. The construction of the segment of I–10 in Mississippi has been under consideration since 1963, and is being built by the Mississippi State Highway Department (MSHD) in conjunction with and pursuant to authorization by the Federal Highway Administration (FHWA). The right-of-way for the Mississippi segment of I–10 was acquired prior to the filing of this action, most of it prior to 1970. Approximately 58.2 miles of I–10 in Mississippi from the Louisiana border to Mississippi State Highway 57 (Highway 57) is near completion. The remaining 18.9 mile segment of I–10 in Mississippi extends from Highway 57 eastward to the Alabama line and contains the 5.7 mile segment in controversy. This 5.7 mile section runs from an interchange at the intersection of I–10 and Highway 57 on the west to the west bank of the Pascagoula River on the east.[2] Within this 5.7 mile segment the plans call for the construction of an interchange at the junction of the Earl Bond Road and I–10. Both the interchange and the 5.7 section of I–10 will transect the habitat of the Mississippi Sandhill Crane, bisecting the eastern unit of a proposed refuge for the crane, and traversing Section 16 land held by the State of Mississippi in trust for the Jackson County School District.

An estimated number of 40 Mississippi Sandhill Cranes [3] still exist, their range being confined to a total area of approximately 40,000 acres in Jackson County, Mississippi. The Department of Interior designated the Mississippi Sandhill Crane an endangered sub-species on June 4, 1973, listing it on the Department's Endangered Species Register per designation at 38 Fed. Reg. 14678, pursuant to

---

**2.** This 5.7 mile section of I–10 transects Sections 18, 17, 16, 15, 14, 13, and 37 of Township 7 South, Range 7 West.

**3.** The Mississippi Sandhill Crane is a sub-species of sandhill cranes. It is the same size as the Florida Sandhill Crane (Grus canadensis pratensis) and prior to 1972 the Mississippi Sandhill Cranes and the Florida Cranes were thought to be of the same sub-species. Aldrich, *A New Sub-species of Sandhill Crane in Mississippi*, 85 Proceedings of the Biological Society of Washington 63 (1972). Mississippi Cranes are distinguishable from other sub-species of sandhill cranes because of darker plumage and the presence of a red tuft on the top of the head.

Beginning in 1965 eggs were taken from the nests of the Mississippi Sandhill Crane population in Jackson County for the purpose of propagation in captivity. In 1971 eight of the Cranes had been reared to adult plumage at the Patuxent Wildlife Research Center, Laurel, Maryland.

Section 3 of the Endangered Species Act of 1969, Pub. L. 91–135, Dec. 5, 1969, repealed and replaced by the Endangered Species Act of 1973, Title 16, U.S.C., Section 1531 *et seq.* The sole natural habitat of the Crane is marked by the Jackson-Harrison County line on the west, the Pascagoula River on the east, United States Highway 90 on the south, and Bluff Creek on the north. For breeding grounds the cranes use only wet, semi-open, and savanna-like lands with marsh areas, with more trees than is typical of the nesting habitat of other sub-species of sandhill cranes. The nests are built in small openings in shallow water from vegetation surrounding the nest. Although the cranes are non-migratory, during the winter months they flock together in a roosting site in the eastern portion of the Pascagoula Marsh.

In 1974, after the right-of-way for the segment of I–10 had been acquired, the U. S. Fish and Wildlife Service (Fish and Wildlife Service) proposed the creation of a Mississippi Sandhill Crane Refuge consisting of two separate units totaling 11,300 acres in Jackson County. The western unit, Ocean Springs,[4] of the proposed refuge lies east of Highway 57 and is bounded and transversed in part on the South by I–10. As noted earlier this portion of I–10 is substantially complete and is not involved in this controversy.[5] The eastern unit, Fountainbleau,[6] of the proposed refuge, which comprises approximately one-half of the total refuge, is traversed at its narrowest point by I–10. This portion of the proposed refuge includes Section 16 land held by the State of Mississippi in trust for the support of the Jackson County School System. By letter dated August 12, 1974, the Fish and Wildlife Service requested

that the Nature Conservancy, a private organization, acquire approximately 2480 acres in the Fountainbleau unit, consisting of four privately owned tracts. In this letter the Director of the Fish and Wildlife Service proposed that the Conservancy acquire the land and hold it until the Service obtained sufficient funding from Congress to purchase it. If, however, the Service was unable to purchase the land within a reasonable time the Conservancy could "take such action as necessary to recover its investment." As a result of this proposal the Conservancy in late 1974 acquired approximately 2000 acres.[7] After the oral argument before us counsel for appellant NWF filed in these proceedings an affidavit of the Director of Land Acquisition of the Nature Conservancy which avers that on November 25, 1975, the Nature Conservancy transferred title to approximately 1,708 acres to the Fish and Wildlife Service.

The Fish and Wildlife Service in 1960 assigned Jacob M. Valentine, Jr., a wildlife management biologist, to study the effects of then proposed I–10 in Louisiana, Mississippi and Alabama. In a 1963 report titled "The Status of the Florida Sandhill Crane in Jackson County, Mississippi" Valentine stated that the proposed route of I–10 would "cross through the area used by the cranes as nesting, loafing, roosting, and feeding grounds". Valentine wrote in the report that at that time the greatest threats to the continued existence of the crane flock were timber management, housing developments, and the proposed I–10, and of the three the first was cause for the most immediate concern. The report concluded by recommending that the "most obvious solution" to avoid detrimental impacts to the Crane would be to

4. The western unit of the refuge when complete will encompass lands in Sections 28, 29, 30, 31, 32, 33, and 34 of Township 6 South, Range 8 West, and Sections 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, and 15 of Township 7 South, Range 8 West.

5. Construction of this portion of I–10 was initiated in advance of the passage of the Endangered Species Act of 1973.

6. The eastern unit of the refuge when complete will encompass lands in sections 4, 5, 8, 9, 10, 15, 16, 20, 21, and 22 of Township 7 South, Range 7 West.

7. The land acquired by the Nature Conservancy is located in Sections 4, 9, 10, 15, 20, 21, and 22 of Township 7 South, Range 7 West.

create a sanctuary comprising 5,000 to 10,000 acres in the area north of U. S. Highway 90, between Highway 57 and the junction of the Earl Bond and Martin Bluff Roads. Valentine also recommended that the route of I–10 be placed two or three miles north of the 1963 survey line, thereby placing the highway on the northern edge of the breeding territory, and that if the route could not be changed then entry-exits should be limited to one at Highway 57 and one at the Earl Bond Road.

On November 23, 1973, the Fish and Wildlife Service notified the MSHD that the Service proposed to acquire 11,360 acres of savanna grassland in Jackson County in order to protect the Mississippi Sandhill Crane, and that the Service was "extremely interested in close coordination involving all roads, interstate interchanges, etc., in this area (more specifically T 6&7 S, and R 7&8 W)." Similar concern was expressed by the Chief of the Game and Fisheries Division of the Mississippi Game and Fish Commission in a letter on September 4, 1974, in which he wrote that "[c]hanging and conflicting land use practices, the effect of highway construction and subsequent residential and commercial developments accelerated by construction, timber management practices, surface drainage and absence of controlled burnings, have contributed to deterioration of the cranes' habitat." The Fish and Wildlife Service wrote to the Assistant Chief Engineer for Planning and Design of the MSHD on September 19, 1974, expressing the opinion that on the basis of available information none of the MSHD's proposed projects would have any adverse impacts on Fish and Wildlife Installations, except for the proposed 11,360 acre refuge in Jackson County. Echoing the concern expressed in its letter of November 23, 1973, the Service again told the MSHD that it was "extremely interested in close coordination involving all roads, interstate interchanges, etc. in . . . the area" of the proposed refuge.

The FHWA on October 29, 1974, approved and adopted a draft environmental impact statement (DEIS) for the construction of I–10 from Highway 57 to the Mississippi-Alabama state line. See National Environmental Policy Act of 1969, Title 42, U.S.C., Section 4332(2)(c); Title 23, U.S.C., Section 128. The Department of Interior requested three additional extensions of time in which to comment on the DEIS, because "the project's involvement with the proposed Sandhill Crane National Wildlife Refuge . . . necessitated consultations . . . with [the Department's] Office of the Solicitor." The Director of Conservation of the State of Mississippi Game and Fish Commission, however, in a letter to MSHD commenting on the DEIS recommended that the plans and specifications for the proposed segment of I–10 should exclude borrow pits[8] from any portion of Sections 15 and 16, of Township 7 South, Range 7 West, in addition to land under option by the Nature Conservancy since "[e]xcavations would lower the water table in immediate areas and take out much more good crane habitat."

The Final Environment Impact Statement, issued on March 10, 1975, incorporated the recommended changes of the Mississippi Game and Fish Commission as to the prohibition of borrow pits in certain areas. Final Environmental Impact Statement Interstate Route No. 10, Jackson County, Mississippi, at 31 (1975) (hereinafter FEIS). The FHWA, MSHD, and the Department of Transportation in the FEIS set forth the impact of I–10 on the Mississippi Sandhill Crane and its habitat as follows in part:

"Environmental impacts will be both negative and positive in nature. One negative impact will be the crossing of the nesting and feeding habitat of the Mississippi Sandhill Crane, a threatened [sic] species. Impacts will result from the taking of crane habitat and from private development which ac-

---

8. A borrow pit is the excavated area remaining after earth has been removed for use as fill for road construction.

companies a new highway facility." FEIS at Summary Sheet.

. . . . .

"B. *DETRIMENTAL IMPACTS*

To properly serve the Gulf Coast area, construction of Interstate Route No. 10 will necessarily have some detrimental effects. The most significant impacts are encroachment on the habitat of the Mississippi Sandhill Crane and the crossing of the Pascagoula River Marsh.

The Threatened Wildlife of the United States, a 1973 U.S. Fish and Wildlife Services publication, states that populations of the crane are declining 'chiefly because of reduction of suitable habitat which is semi-open and wet savannah by changing land use including drainage, planting of trees, suburban development, and highway building.' This section of Interstate Route No. 10 would commit approximately 40 acres of the crane's best nesting and feeding range to highway right of way. *Other than this loss of habitat, the direct effects of a highway facility on the existence of the crane are relatively unknown.* This is due to the fact that a major highway has not been constructed through their habitat area since the species has fallen under such close scrutiny.

*The indirect effects of highway development, specifically the effects of residential and commercial development, are known, however. The crane cannot survive in built-up areas, and a certain amount of private development will always accompany construction of a major highway facility. This new development within the crane's habitat is the most significant effect that is to be feared. Unfortunately, the Mississippi State Highway Department has no control over private development outside the highway right of way.* Another possible effect could be caused by the highway drainage ditches and structures.

There are, however, certain measures underway to lessen the impact of the highway. First of all, Interstate Route No. 10 will be a full control of access facility, thus restricting private development to interchange and frontage road areas only. Secondly, the Nature Conservancy, in conjunction with the U.S. Fish and Wildlife Service, is attempting to acquire several thousand acres in Jackson County in order to form a Federal Refuge for the Mississippi Sandhill Crane. Also, the Gulf Regional Planning Commission has recognized certain areas for resource conservation which include the nesting areas for the crane." FEIS at 23–24 (Emphasis added).

. . . . .

"The relative isolation of the crane colony and the general poverty of the soil in the area initially provided the security required for the crane's existence. This security has been threatened by the forces of civilization, thus bringing about a decrease in their numbers. The most destructive force on the crane, to date, has been timber management . . . . . . *Although timber management is no longer practiced in the habitat area, it did not cease before thousands of acres of savannahs and swamps were destroyed.*

*At the present time, the greatest threats to the existence of the Mississippi Sandhill Crane are private development and the construction of Interstate Route No. 10.* Unfortunately, the Mississippi State Highway Department has no control over private development of privately owned land.

. . . . .

As for the construction of Interstate Route No. 10, it is exceedingly difficult to assess the exact impact of the highway on the crane. *One direct effect will be the removal of approximately 180 acres from the crane's range; this includes approximately 40 acres of nesting and feeding range and approximately 140 acres of roosting, loafing, and feeding range.* This loss

of a small amount of habitat and its associated disturbance can be tolerated, according to a report prepared in 1963 by Jacob M. Valentine, Jr., Wildlife Management Biologist, Bureau of Sport Fisheries and Wildlife. *Also, drainage ditches associated with the facility could affect the water table to a slight degree.* The soil on the savannahs is predominately the poorly drained Rains soil with the seasonally high water table at the soil surface. *A lowering of the water table could cause brushy vegetation to establish in areas drained by these ditches. This effect could possibly extend as far as 70 feet beyond the highway right of way. It is felt that the primary effects of the highway will not come from the physical existence of the facility but from the inherent development which accompanies a new highway.*

. . . . . .

*As for measures to minimize harm caused by construction of the proposed project, most of these are initiated due to the design of the facility.* Interstate Route No. 10 will be a full control of access facility, and the right of way limits will be fenced. This will preclude animal and pedestrian access to the highway at the same time preventing general trespass into the crane's habitat. Because access to the highway will be limited to interchanges and frontage roads, the facility should effectively block the construction of other roads in this remote area. *This same fact will restrict development to interchange and frontage road areas,* thus prohibiting development all along the facility. This should help to maintain the crane's security." FEIS at 26–31 (Emphasis added).

Subsequent to approval of the FEIS by the Council on Environmental Quality, the NWF on March 21, 1975, wrote to appellee Tieman to express opposition to the construction of I–10 through the habitat of the Mississippi Sandhill Crane because of alleged violations of § 4(f)

and § 7. In this letter the NWF recommended that the FHWA take no further action on the construction of I–10 in the area of the crane's habitat until the Secretary of the Department of Interior and the FHWA had discharged their respective obligations under § 7, and until the Secretary of Transportation had evaluated the applicability of § 4(f) to the project. On April 3, 1975, the Deputy Assistant Secretary of the Interior, Stanley Doremus, wrote to appellee Shaw commenting upon the FEIS and expressing the Interior Department's opposition to the project because of the potential for adverse effects on the habitat of the Mississippi Sandhill Crane. Further, Deputy Assistant Secretary Doremus stated the Interior Department's concern under § 7 for "interagency consideration of possible project changes which may avoid some of the adverse environmental effects." In relating the detrimental impacts of the proposed route of I–10 on the crane, Doremus noted that every acre of actual or potential habitat is vital to the survival of the crane and that there would be a direct loss of at least 406 acres of habitat, rather than the 180 acre estimate in the FEIS, plus additional direct loss of habitat resulting from the excavation of borrow pits. Although acknowledging that the MSHD has no direct control over private development outside of the highway right-of-way, Doremus stated that "the location of private development is controlled by highway routing and placement of interchanges", and, therefore, pointed out that the exclusion of an interchange at the Earl Bond Road "would retard commercial and residential development along this segment of the project". Finally, in summary, three key items were found by the Department of Interior to warrant major consideration:

"1. All possible route alignments and designs which avoid or minimize adverse impacts on endangered species habitat,

2. Elimination of the I–10 interchange at Earl Bond Road (Gautier-Vancleave Road), and

3. Deletion from the proposed construction plans of all borrow pit/spoil areas along the right-of-way between [Highway] 57 and Martin Bluff Road."

The Department of Interior on April 25, 1975, again expressed its opposition to the segment of I–10 through Jackson County on the ground that the FEIS inadequately addressed the potential adverse effects on the Mississippi Sandhill Crane habitat.

The FHWA through appellee Shaw on April 30, 1975, gave final approval under Title 23, U.S.C., Section 106(a) of the plans, specifications, and estimates (P.S.&E. approval) for the 5.7 mile section of I–10 in controversy. On May 6, 1975, Curtis Bohlen, the Acting Assistant Secretary of the Interior Department wrote to appellee Tieman:

"To date, we are not aware that the Federal Highway Administration has instituted the necessary consultation requirements under [§ 7] of the Endangered Species Act. This letter is to request that you initiate such consultation. In addition, the Secretary of Interior must make a determination as to whether or not the habitat to be affected by this project is critical to the Mississippi sandhill crane. This

determination must be made before the Federal Highway Administration will be able to fulfill the requirements of [§ 7]: that is, to ensure that the action authorized by you will not result in destruction or modification of such habitat."

On May 23, 1975, the appellants filed this suit in the district court. Although the MSHD let a contract for the 5.7 mile section in controversy on May 27, 1975, submission of that contract to the FHWA for approval was stayed pending the trial of this action. FHWA approval was given on August 5, 1975, and actual construction was begun on September 1, 1975, with a target completion date of May 29, 1978.

The day before the trial of this action, June 25, 1975, the Director of the Fish and Wildlife Service issued pursuant to Section 4(f) of the Endangered Species Act of 1973, Title 16, U.S.C., Section 1533(f)(2)(B), an emergency determination of "critical habitat" for the Mississippi Sandhill Crane.[9] The "critical habitat" as delineated in this determination consists of approximately 100,000 acres in Jackson County and includes land transected by the highway project. The designation of "critical habitat" for the cranes became effective on publication

---

**9.** On April 22, 1975, the Department of Interior and the Department of Commerce published at 40 Fed.Reg. 17764–17765 the following interpretation of "critical habitat" as it relates to § 7 of the Endangered Species Act:

"The term 'habitat' could be considered to consist of a spatial environment in which a species lives and all elements of that environment including . . . land and water area, physical structure and topography, flora, fauna, climate, human activity, and the quality and chemical content of soil, water and air.

'Critical habitat' for any Endangered or Threatened species could be the entire habitat of any portion thereof, if, and only if, any constituent element is necessary to the normal needs or survival of that species."

. . . . .

"Actions by a Federal agency which result in the destruction or modification of habitat considered 'critical habitat' for a given Endangered . . . species would not conform with section 7 of the Endangered Spe-

cies Act . . . ., if such an action might be expected to result in a reduction in the numbers or distribution of that species of sufficient magnitude to place the species in further jeopardy, or restrict the potential and reasonable expansion or recovery of that species. [A]pplication of the term 'critical habitat' may not be restricted to the habitat necessary for a minimum viable population.

It is emphasized further that certain actions may not be detrimental to 'critical habitat'. There may be many kinds of actions which can be carried out within the 'critical habitat' of a species that would not be expected to result in such reduction in the numbers or distribution or otherwise adversely affect such species."

The Fish and Wildlife Service published a notice at 40 Fed.Reg. 21499–21501, May 16, 1975, to announce its intent to determine "critical habitat" for 108 endangered species, and that the Service was interested in receiving data quickly on ten species, including the Mississippi Sandhill Crane.

at 40 Fed.Reg. 27501–27502, June 30, 1975. The Fish and Wildlife Service stated that the reasons for the emergency determination were that "[t]he maintenance of significant portions of habitat and the well-being of the crane are threatened by construction of a new segment of Interstate Highway I–10 between Mississippi State Highway 57 and the Pascagoula River", and that "[t]he construction activities, destruction of habitat, incidental intrusions, and subsequent related commercial and residential development of the area all constitute a significant risk to the well-being of the crane".[10] 40 Fed.Reg. at 27502.

## SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT

Section 4(f) requires in part that the Secretary of Transportation not approve any project which requires the use of *publicly* owned land from a park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance or *any land* from an historic site of national, state, or local significance *unless* the Secretary *finds there is no feasible and prudent alternative* to the use of such land, and that all possible planning

has been done to minimize harm to that protected area.[11] The appellants contend that the district court erred in holding that § 4(f) is inapplicable to certain lands affected by the highway project. This holding by the district court was based on two grounds: (i) that there are no § 4(f) lands used by the 5.7 miles segment of I–10, and (ii) that an opinion rendered by the Office of the Attorney General of Mississippi that the lands in question are not "publicly owned lands from a public park, recreation area, or wildlife and water fowl refuge" within the meaning of § 4(f) was binding on the Secretary of Transportation.

■ Prior to our discussion of the applicability of § 4(f) to the project, we address the issue of whether the district court erred in holding that the opinion of the Office of the Attorney General of Mississippi was determinative of the applicability of § 4(f) and binding on the Secretary of Transportation.[12] This court in *Named Individual Members of the San Antonio Conservation Society v. The Texas Highway Department,* 5 Cir. 1971, 446 F.2d 1013, cert. denied 1972, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136, stated that Congress in enacting

10. The emergency determination of critical habitat for the Mississippi Sandhill Crane remained in effect for only 120 days following its publication in the Federal Register. Therefore, the Fish and Wildlife Service on September 3, 1975, announced at 40 Fed.Reg. 40521–40522, a proposal to amend 50 C.F.R. Part 17 by adding a new Subpart F thereto for "critical habitats" and a new § 17.80 thereunder which would designate "critical habitat" for the Mississippi Sandhill Crane. The Service requested that all comments on this proposed amendment be received by the Service no later than October 6, 1975. This period was later extended to October 31, 1975. 40 Fed.Reg. 49348.

11. Section 4(f) of the Department of Transportation Act, Title 49, U.S.C., Section 1653(f) provides in full:

"It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Develop-

ment, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreation area, wildlife and waterfowl refuge, or historic site resulting from such use."

Section 138 of the Federal-Aid Highway Act of 1968, Title 23, U.S.C., Section 138, is virtually identical in language to § 4(f), and the variances are inconsequential. *See* Conf.Rep. No.1799, 90th Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 3531, 3538 (1968).

§ 4(f) clearly "did not intend to leave the decision whether federal funds would be used to build highways through parks of local significance up to the city councils across the nation". *Id.* at 1026. Similarly, we find that the national policy "to preserve . . . wildlife and waterfowl refuges" would be frustrated by vesting in state or local officials having jurisdiction over publicly owned lands to be used for a federally funded highway the authority to make a final and binding determination of local significance. A more reasonable and enlightened interpretation of § 4(f) is that Congress intended that the threshold determination of the significance and use of state and local lands be made by those officials who are most likely to be aware of its importance to the local community and society. Once the appropriate jurisdictional officials, however, have made the initial determination of whether potentially protected § 4(f) lands are used for one of the purposes enumerated and are of national, state or local significance that decision is reviewable and reversible by the Secretary of Transportation. See *Environmental Defense Fund v. Brinegar,* E.D.Pa.1974, 6 ERC 1577, 1593–94; *Harrisburg Coalition Against Ruining the Environment v. Volpe,* M.D.Pa.1971, 330 F.Supp. 918, 929.

The district court mistakenly relied upon dicta in *Pennsylvania Environmental Council, Inc. v. Bartlett,* 3 Cir. 1971, 454 F.2d 613, 623. Section 4(f) on its face gives the appropriate jurisdictional official the power only to assess "significance", and the Supreme Court has stated that the legislative history of that section indicates that the Secretary must go beyond the information supplied by state and local officials to reach "his

own independent judgment". *Citizens to Preserve Overton Park, Inc. v. Volpe,* 1971, 401 U.S. 402, 412, n. 28, 91 S.Ct. 814, 821, 28 L.Ed.2d 136, 151.[13]

The FEIS indicates that the Secretary of Transportation and the Department of Transportation fulfilled their duties under § 4(f) by reviewing the opinion rendered by the Office of the Attorney General of Mississippi and concluding that "[t]he project will not affect any 4(f) lands of any type". FEIS at 47–48. The appellants, however, assert that § 4(f) is applicable: (i) to the Section 16 land since it is publicly owned land used *in fact* as a sanctuary by the Mississippi Sandhill Crane; and (ii) to the land formerly held by the Nature Conservancy at the request of the Fish and Wildlife Service for the creation of a refuge which because of its actual use and beneficial ownership should be considered public land from a wildlife and waterfowl refuge.

■ Not all publicly owned land or land used as a wildlife refuge is protected by § 4(f). Section 4(f) of the Department of Transportation Act of 1966 originally provided:

"The Secretary shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of this Act, the Secretary shall not approve any program or project which requires the use of *any land from a public park, recreation area, wildlife and waterfowl refuge or historic site* unless (1) there

---

**12.** The appellants concede in this court that the State of Mississippi holds title in trust for the Jackson County School District to the Section 16 lands in controversy, see Miss.Const. Art. 8, Section 211; *Jefferson Davis County v. Sinrall Lumber Co.,* Miss. 1909, 94 Miss. 530, 49 So. 611, and that this confers on the State jurisdiction under § 4(f) to make the threshold determination of whether this land is a wildlife refuge of state or local significance.

**13.** The Third Circuit in *Pennsylvania Environmental Council, Inc. v. Bartlett,* 454 F.2d at 622, n. 10, quoted with approval a passage from this court's opinion in *Named Individual Members of the San Antonio Conservation Society v. The Texas Highway Commission,* supra, wherein we stated that the decision of local officials was not determinative of whether federal funds would be used to build highways through parks of local significance.

is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use." Pub.L. 89–670, § 4, Oct. 15, 1966, 80 Stat. 933 (Emphasis added). The Federal-Aid Highway Act of 1968, § 18(a), (b) amended § 4(f) [14] by narrowing the applicability of that section to *"publicly owned"* land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance. The statute, however, was not narrowed with respect to the ownership of land from historic sites, and the use of *"any land"* from an historic site for a highway project irrespective of ownership continues to fall within the ambit of § 4(f). See note 11, *supra.* Hence, after the 1968 amendment the duty of the Secretary was restricted with respect to parks, recreation areas, and wildlife and waterfowl refuges. *Wildlife Preserves, Inc. v. Volpe,* 3 Cir. 1971, 443 F.2d 1273, 1274–75. Section 4(f) as amended is applicable only if two conditions are satisfied by the land in question: first, except for land from an historic site, the land to be used by a project must be publicly owned, and second, the land must be from one of the enumerated types of publicly owned land, *i. e.,* a public park, recreational area, or wildlife and waterfowl refuge. See *Id.* at 1274–75; *Citizens Environmental Council v. Volpe,* D.Kan.1972, 364

F.Supp. 286, 295, aff'd 10 Cir. 1973, 484 F.2d 870, cert. denied 1974, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286; *Daly v. Volpe,* D.Wash.1972, 350 F.Supp. 252, 256, aff'd 9 Cir. 1974, 514 F.2d 1106. None of the land in question satisfied *both* of these conditions at the time of trial.

■ The Section 16 land held in trust by the State of Mississippi although publicly owned has never been designated or administered, formally or informally, as a wildlife refuge, or for any of the other purposes enumerated in § 4(f). The land acquired by the Nature Conservancy in 1974, although held for future use as a wildlife refuge, was not publicly owned, at the time the right-of-way for the project was acquired, nor at the time approval of plans, specifications and estimates was given, the construction contracts were awarded, and construction on the highway was begun. The letter of August 2, 1974, from the Director of the Fish and Wildlife Service to the Conservancy only proposed that the latter purchase and hold lands in Jackson County for possible future transfer to the service, if Congressional funding was obtained. Only if and when this future transfer occurred, and only after the Fish and Wildlife Service declared the land to be a wildlife refuge through publication in the Federal Register would the land have satisfied both conditions to the applicability of § 4(f).[15] The subsequent transfer on November 25, 1975, of title

---

**14.** The Federal-Aid Highway Act of 1968, Pub.L. 90–495, § 18, Aug. 23, 1968, 82 Stat. 824, also amended § 4(f) by adding a declaration of policy, and by narrowing the statute to encompass only certain types of lands which are determined to be of "national, State, or local significance." Title 49, U.S.C., Section 1653(f). See note 11 *supra* and accompanying text.

**15.** The August 2, 1974, letter did not contractually bind the Fish and Wildlife Service to purchase the land from the Conservancy. That letter specifically stated that acquisition by the Service was contingent upon Congressional funding, and that if such funding was not forthcoming within a reasonable time the Conservancy could "take such action as is

necessary to recover its investment, including placing the property for sale on the open market if no conservation purchaser could be found". Further, the Department of Interior, contrary to assertions of the appellants, viewed that letter as no more than a request that the Conservancy acquire the land and that it did not vest in the Department an enforceable property right in the lands so acquired. Curtis Bohlen, the Deputy Assistant Secretary for Fish, Wildlife and Parks of the Department of Interior stated in a deposition filed in the district court that the Department was only "morally obligated" and not "legally obligated" to purchase the land from the Conservancy.

to 1,708 acres of this land to the Service by the Conservancy occurred after construction on the highway had begun, and could not of course make § 4(f) applicable after the fact.

In summary, we hold that the district court did not err in finding that the 5.7 mile section of I–10 will not use any "publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge" in Jackson County, Mississippi. Therefore, the Secretary of Transportation was not required, prior to approving the project, to find that there was no feasible and prudent alternative to the use of the land in question and that the program included all possible planning to minimize harm to the sanctuary of the Mississippi Sandhill Crane. Further, since no § 4(f) lands were used by the project the Secretary was not required to reach his own judgment with respect to the "national, State, or local significance" of the lands traversed by the highway.

## SECTION 7 OF THE ENDANGERED SPECIES ACT OF 1973

■ Section 7 of the Endangered Species Act of 1973 imposes on Federal agencies the duty to "insure that actions authorized, funded, or carried out" by them do not jeopardize the continued existence of any endangered species or result in the destruction or modification of habitat of such species which the Secretary of Interior determines to be critical.[16] Hence, § 7 imposes on federal agencies the mandatory duty to insure that their actions will not either (i) jeopardize the existence of an endangered species, or (ii) destroy or modify critical habitat of an endangered species.[17] The primary responsibility for implementing § 7 is on the Secretary of Interior. Federal agencies are required to consult and obtain the assistance of the Secretary before taking any actions which may affect endangered species or critical habitat. However, once an agency has had meaningful consultation with the Secretary of Interior concerning actions which may affect an endangered species the final decision of whether or not to proceed with the action lies with the agency itself. Section 7 does not give the Department of Interior a veto over the actions of other federal agencies, provided that the required consultation has occurred. It follows that after consulting with the Secretary the federal agency involved must determine whether it has taken all necessary action to insure that its actions will not jeopardize the continued existence of an endangered species or destroy or modify habitat critical to the existence of the species.[18] Once that

16. Section 7 of the Endangered Species Act of 1973, Title 16, U.S.C., Section 1536 provides in full:

"The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical."

17. The House Report on the Act emphasizes the mandatory nature of the duty imposed on federal agencies:

"This subsection . . . requires that agencies take the necessary action that will not jeopardize the continued existence of endangered species or result in the destruction of critical habitat of those species." H.Rep. No.93–412, 94rd Cong., 1st Sess.

18. See remarks of Senator Tunney, floor manager of the bill in the U.S. Senate:

"So, as I read the language [of § 7], there has to be consultation. However, the Bureau of Public Roads or any other agency would have the final decision as to whether such a road should be built. That is my interpretation of the legislation at any rate." 119 Cong.Rec., S. 14536 (July 24, 1973).

decision is made it is then subject to judicial review to ascertain whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153. See Title 16, U.S.C., Section 1540(g).

In the present case the appellants have the burden of proving that the appellees have failed to take the "action necessary to insure" that the 5.7 mile segment of I–10 does not jeopardize the continued existence of the Mississippi Sandhill Crane or will not destroy or modify habitat determined by the Department of Interior to be critical to the cranes' existence. The court below held that the appellants had failed to meet this burden because the evidence showed that "the defendants have adequately considered the effects of this project on the Crane". *National Wildlife Federation v. Coleman, supra,* 400 F.Supp. at 712. Further, the district court found that the FEIS and other documents from the administrative records of the appellees which tended to show that I–10 may be a threat to the continued existence of the cranes "merely reflect opinions of the effect of the highway on the Crane without specifying facts upon which they are based". *Id.* at 711. With respect to the appellants' allegation that private development accompanying the construction of I–10 will jeopardize the existence of the cranes and result in the destruction of critical habitat, the district court found that "the record . . . is totally devoid of any statement or opinion rising above mere speculation to indicate that such development will occur or is even likely to occur". *Id.* at 712.

The evidence to which the district court attached particular significance was the testimony of appellants' witness Jacob Valentine, the author of the 1963 report on the crane, *supra,* and the country's foremost expert on the crane. On direct examination, Valentine testified that every acre of habitat is vital to the cranes' existence, and that the construction of I–10 as planned will put the existence of the cranes in jeopardy. The construction of the highway will in Valentine's opinion result in the *direct* loss of approximately 300 acres of habitat taken as right-of-way. The direct loss of this 300 acres according to Valentine would not deny the cranes space for normal growth, movements, or territorial behavior. But Valentine continued that additional loss of habitat would result from the physical presence of borrow pits, and by the resultant drainage of wetlands caused by the excavation of borrow pits. He expressed concern also about the loss of habitat resulting from noise, vibratory disturbance, and pollution from highway construction and traffic, although no tests had been conducted to determine their effect on the cranes. Valentine testified that his views had changed since 1963, and that the main effect of the highway so far as the crane is concerned is the stimulation of private development which will be induced by the construction of this segment of I–10. Valentine testified in this regard that the single most destructive aspect of the highway to the Crane and its habitat was the proposed interchange at the Earl Bond Road, which would generate development in the cranes' habitat. Concerning his conclusion in the 1963 report that timber management was the most imminent threat to the Crane, Valentine testified that headway has been made in reaching an agreement on a habitat management plan with paper companies operating in the area. In addition, Valentine stated that he now believes that the crane could withstand the dangers of timber management if I–10 were not constructed. Most important to the survival of the crane in Valentine's opinion would be the creation of a refuge in Jackson County. He testified also that the FHWA should be required to purchase land to replace habitat taken by the highway. Finally, Valentine stated that in addition to the cre-

ation of a refuge the most important things to be done to save the crane from extinction are the elimination of the interchange at the Earl Bond Road and of borrow pits from sensitive crane habitat.

Valentine's concern for the effects of the highway on the crane and its habitat substantially echoed the views of the Department of Interior and the Fish and Wildlife Service as expressed in their correspondence with the FHWA and MSHD. Those agencies have since 1973 expressed opposition to the project because of the potential for adverse effects on the habitat of the crane. Further, the modifications in the project recommended by Valentine are identical to those items which the Interior Department found to warrant "major consideration". The extent of the Department of Interior's concern for the effects of the project on the crane is evidenced by its "Emergency Determination of Critical Habitat for the Mississippi Sandhill Crane", note 9, *supra*, and accompanying text. The express justification for this emergency was the construction of this segment of I–10 which threatened "the well-being of the crane". 40 Fed.Reg. at 27502.

■ In holding that the appellees have "adequately considered" the effects of the highway on the crane, the district court misconstrued the directive of § 7. As we have pointed out, § 7 imposes on all federal agencies the mandatory obligation to insure that any action authorized, funded, or carried out by them does not jeopardize the existence of an endangered species or destroy critical habitat of such species. See text accompanying note 16 *supra*. Although the FEIS and the administrative record indicates that the appellees have recognized and considered the danger the highway poses to the crane, they have failed to take the necessary steps "to insure" that the highway will not jeopardize the crane or modify its habitat.

The district court placed undue emphasis on Valentine's estimate of the direct loss of only 300 acres of habitat taken by highway right-of-way. All of the evidence indicates that the 5.7 mile segment of I–10 will undoubtably affect the crane and its habitat in addition to the mere taking of 300 acres of right-of-way. The relevant consideration is the total impact of the highway on the crane. As the D.C. Circuit has noted, "a far more subtle calculation than merely totaling the number of acres to be asphalted" is required where the environmental impact of a project is at issue. *D. C. Federation of Civic Associations v. Volpe*, 1972, 148 U.S.App.D.C. 207, 459 F.2d 1231, 1239. *Cf. Brooks v. Volpe*, 9 Cir. 1972, 460 F.2d 1193, 1194. Although it is clear that the crane can survive the direct loss of 300 acres of habitat, the evidence, including the FEIS, shows that it is questionable whether the crane can survive the additional loss of habitat caused by the indirect effects of the highway, coupled with the excavation of and drainage caused by borrow pits.

■ Principal among the indirect effects of the highway on the crane is the residential and commercial development that can be expected to result from the construction of the highway. The district court found that the record contained no statement or opinion rising above "mere speculation" to indicate that such development is likely to occur. We disagree. In addition to the testimony of Valentine and the letters from the Department of Interior and the Fish and Wildlife Service, the FEIS acknowledges in three places that private development always accompanies the construction of a major highway and that this development is the primary effect of I–10 on the crane. FEIS, *supra*. Further, the Department of Housing and Urban Development in a letter to the MSHD commenting on the FEIS stated that construction of this segment of I–10 "will bring with it a concentration of urban growth around interchanges and other selected areas". FEIS at 93. These predictions by the FHWA, the MSHD, and HUD, agencies experienced in highway

and urban development, recognize that private development will accompany the construction of I-10 in Jackson County. The fact that the private development surrounding the highway and the Earl Bond Road interchange does not result from direct federal action does not lessen the appellee's duty under § 7. *Cf. City of Davis v. Coleman,* 9 Cir. 1975, 521 F.2d 661, 677; *National Forest Preservation Group v. Butz,* 9 Cir. 1973, 485 F.2d 408, 411–12. The appellees do control this development to the extent that they control the placement of the highway and interchanges.

 The federal appellees contend that the decision to build the highway was made on the assumption that the Fish and Wildlife Service would acquire a refuge for the crane, and that the Gulf Regional Planning Commission had recognized certain areas for conservation in Jackson County. The FHWA believed that these measures would lessen the impact of the highway on the crane. This reliance on the proposed actions of other agencies does not satisfy the FHWA's burden of insuring that its actions will not jeopardize the continued existence of the crane. Further, even if these actions were taken, the Department of Interior has determined that approximately 100,-000 acres of habitat in Jackson County is critical within the meaning of § 7, whereas the refuge proposed by the Fish and Wildlife Service contains only 11,300 acres, note 4, *supra,* and accompanying text. The appellees argue that their concern for the crane is also demonstrated by the fact that the highway will cross the proposed refuge at its narrowest point.[19] Under § 7, however, the relevant consideration is the area determined by the Secretary of Interior as "critical habitat" for the crane, note 9, *supra,* and accompanying text. The Secretary has delineated an area of 100,000 acres in Jackson County as "critical habitat" under § 7 for the Mississippi Sandhill Crane, and the proposed segment of I-10 traverses an extensive portion of this 100,000 acres. 40 Fed.Reg. 27501–27502. The duty of the appellees is to insure that their actions will not destroy or modify this "critical habitat", and not just the area within the habitat of the crane to be set aside as a refuge.

 Similarly, the fact that timber management practices have in the past destroyed habitat of the crane does not lessen the duty of the appellees to insure that the highway and the accompanying private development do not jeopardize the existence of the crane or destroy critical habitat.[20] We note that the appellees' FEIS states that at "the present time the greatest threats to the existence of the Mississippi Sandhill Crane are private development and the construction of Interstate Route No. 10". FEIS at 26. Hence, irrespective of the past actions of others the appellees have a duty to insure that the highway and the development generated by it do not further threaten the crane and its habitat.

Finally, it is beyond question from the record that the excavation of borrow pits within the area determined by the Secretary of Interior to be "critical habitat"

---

**19.** We note in this regard that the district court erred in its finding that the "route of the highway has clearly been chosen to pass through the smallest part of the Crane's *habitat* and nesting area". *National Wildlife Federation v. Coleman, supra,* 400 F.Supp. at 712 (emphasis added). The highway will pass through the narrowest point of the proposed *refuge.*

**20.** The statement by the district court, 405 F.Supp. at 711, which we deem a critical finding, that Valentine "repeatedly stated that the main threats to the continued existence of the . . . . Crane are poor timber management, housing and industrial development . . . .,

and I-10, in that order" is not borne out by the record. Valentine testified that timber management has been a major danger to the crane, and that in 1963 he considered it the most important potential danger to the crane. Record at 44–45. Further, while at the time of trial Valentine was of the opinion that timberlands within the habitat of the crane were not being properly managed, he further testified that certain actions had been taken by the paper companies to safeguard the habitat of the crane, and that consultations between the Fish and Wildlife Service and the paper companies were continuing. Record at 87–89.

for the crane will destroy and modify that habitat, in violation of § 7. The appellees assert that the FEIS recognized the potential danger of borrow pits to the habitat of the crane, and that the contract plans and specifications for the highway prohibit the forming of borrow pits from any land under option by the Nature Conservancy and in Sections 15 and 16, Township 7 South, Range 7 West. FEIS at 31. The prohibition of borrow pits in these areas, however, does not satisfy the directive of § 7, since it does not prohibit the excavation of borrow pits in the entire 100,000 acres of habitat determined to be "critical" by the Secretary.

## RELIEF

The appellants do not seek a permanent injunction against the construction of the highway. Rather they seek only that an injunction issue until such changes are made in the project as will enable the Secretary of the Department of Interior to conclude that the project will not jeopardize the continued existence of the Mississippi Sandhill Crane, or destroy or modify critical habitat of the crane. The modifications in the project which the appellants contend will bring the highway into compliance with § 7 are: (i) the elimination of the Earl Bond Road interchange, (ii) the elimination of borrow pits in the area determined to be critical habitat, and (iii) the acquisition of land by the FHWA to mitigate the loss of critical habitat taken by the highway.

Because the Department of Interior has primary jurisdiction for administering the Endangered Species Act, and the subject matter of this lawsuit is within the specialized field of the Department we defer to its determination of what modifications are necessary to bring the highway project into compliance with § 7. Therefore, we direct the district court on remand to enter its injunctive order restraining and enjoining the appellees as follows:

(a) From initiating or carrying out any further work or incurring any further contractual obligations with respect to the interchange at the Earl Bond Road;

(b) From excavating any borrow pits in the area determined to be critical habitat for the Mississippi Sandhill Crane under the notice published on June 30, 1975, at 40 Fed.Reg. 27501–27502.

This injunction is to remain in force until the Secretary of the Department of Interior determines that the necessary modifications are made in the highway project to insure that it will no longer jeopardize the continued existence of the Mississippi Sandhill Crane or destroy or modify critical habitat of the Mississippi Sandhill Crane.[21] We do not reach a decision as to whether the FHWA can be ordered to acquire land to replace that taken by the Highway project, since we are confident that the Secretary of Transportation and the Secretary of Interior will take all actions necessary on remand to protect the continued existence of the Mississippi Sandhill Crane and its habitat.

Reversed and remanded with directions.

See Appendix A on next page.

ON PETITION FOR REHEARING

PER CURIAM:

IT IS ORDERED that the petition for rehearing of William T. Coleman joined by the remaining federal defendants-appellees filed in the above entitled and numbered cause be and the same is hereby DENIED.

---

21. The complaint filed by the appellants in the district court did not allege that the State appellee had violated § 7. Hence, the State appellee contends that the ruling of the district court cannot be overturned insofar as it concerns the State appellee. The State of Mississippi, however, voluntarily sought federal funding for this project, and thereby submitted itself to federal law, including § 7 of the Endangered Species Act. See *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., supra,* at 1027–28.